Argued July 9, affirmed September 18, 1968

# IRON FIREMAN MANUFACTURING COMPANY,
*Respondent, v.* STATE TAX COMMISSION,
*Appellant.*

445 P. 2d 126

*Theodore W. deLooze*, Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Robert Y. Thornton, Attorney General, and G. F. Bartz, Assistant Attorney General, Salem.

*Thomas S. Moore*, Portland, argued the cause for respondent. With him on the brief were Morrison & Bailey, Portland.

Before PERRY, Chief Justice, and MCALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and RODMAN, Justices.

McALLISTER, J.

The State Tax Commission appeals from a decree of the Oregon Tax Court, 3 OTR Adv Sh 35 (1967), holding that plaintiff, Iron Fireman Manufacturing Company, was entitled to exclude from its income taxable in Oregon that portion of its income derived during 1960 and 1961 from business done within the state of Washington.

The plaintiff Iron Fireman Manufacturing Company, now merged into Electronic Specialty Co., and hereinafter known as ESCO, is an Oregon manufacturing corporation, with its plant in Portland. During the years 1960 and 1961 plaintiff manufactured, sold and delivered to Boeing Aircraft Company in Seattle, some 700 different airplane parts incorporated by Boeing into the airplanes manufactured by it.

■ The usual test of ESCO's right to apportion is whether Washington, if it had Oregon's tax laws, could

tax ESCO on that portion of its income derived from its Washington activities. *Cal-Roof Wholesale v. Tax Com.*, 242 Or 435, 445, 410 P2d 233 (1966). It is conceded that during 1960 and 1961 ESCO was engaged in business in Washington within the meaning of ORS 314.280, and except for Public Law 86-272, 15 USC § 381 (1964), was entitled to apportion its income between Oregon and Washington.

■ The case turns on whether Public Law 86-272 is applicable. The portion of that statute pertinent to this case reads as follows:

> "§ 381. (a) No State, * * *, shall have power to impose, * * *, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
>
> "(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
> "* * * * * *"

It will be noted that the above statute would prohibit Washington from taxing ESCO's income derived from its business in Washington if that business consisted only of solicitation of orders, and if the orders were sent outside Washington for approval or rejection, and, if approved, were filled by shipment or delivery from a point outside Washington.

In *Smith Kline & French v. Tax Com.*, 241 Or 50, 403 P2d 375 (1965), we held that P. L. 86-272 was constitutional. In *Cal-Roof Wholesale v. Tax Com., supra*, we held that the term "solicitation" as used in P. L.

86-272 should not be given a broad interpretation. In *Herff Jones Co. v. Tax Commission,* 247 Or 404, 430 P2d 998, 1001 (1967), we quoted with approval our holding on this point in *Cal-Roof Wholesale v. Tax Com., supra.* We think the term should be given its generally accepted meaning in the light of its legislative history. See S. Rep. No. 658, 86th Cong. 1st Sess. (1959); H. R. Rep. No. 936, 86th Cong. 1st Sess. (1959); H. R. Conference Rep. No. 1103, 86th Cong. 1st Sess. (1959); see also, Beaman, *Paying Taxes to Other States,* ch 6, p. 63 (1963); Barnes, *State Taxation of Interstate Commerce,* 16 W Res L Rev 859, at 871 (1965).

The tax court held that ESCO's activities amounted to more than solicitation and that ESCO was entitled to apportion its income. The facts on which the tax court based its finding are stated in its opinion, 3 OTR Adv Sh at 36-37, as follows:

"Prior to and during 1960 and 1961 plaintiff was engaged in manufacturing air frame components, subassemblies and assemblies, primarily for Boeing Aircraft Company in Seattle, Washington. Plaintiff and Boeing had a very close working arrangement because of the nature of plaintiff's highly specialized business of manufacturing airplane parts.

"Orders were not solicited as in the normal business arrangement because the two companies had been dealing with one another for years. The solicitation was indirect. Plaintiff's manager testified that he spent a substantial amount of time in the Boeing plant, selecting the items that plaintiff wanted to bid and persuading Boeing Company that plaintiff was qualified to manufacture the desired items. Most of plaintiff's activities related to the structural parts and control assembly of the Boeing 727 airplane. Plaintiff's officials maintained extremely close liaison with the Boeing officials on

the planning and design of the items so they would be both functional and 'the most economical for producibility.' After the parties had agreed on a contract for plaintiff to manufacture certain items the close working relationship continued between the specialists for both companies. Many of plaintiff's officials made regular trips to Boeing to take care of 'manufacturing problems, installation problems, repair work, redesign discussions, production problems' which occurred after the work had started on the manufactured parts. Plaintiff's production engineers, production workers, metallurgists, quality control managers and assembly supervisors were some of the officials who spent several weeks of the year working closely with Boeing in Seattle.

"Plaintiff's agreement with Boeing required plaintiff to retain a skilled metallurgist and plaintiff's manager, together with one of Boeing's officials, interviewed applicants and collaborated on the selection. The metallurgist before going to work for plaintiff would spend several weeks receiving indoctrination at Boeing, learning Boeing's methods and requirements. Plaintiff also had a contract administrator who worked with Boeing on schedule planning, disputes, change incorporations, and with Boeing's legal counsel on changes. Plaintiff's engineers spent substantial time at the Boeing plant being coached in Boeing procedures. On some occasions plaintiff's assembly superintendent went to Boeing when the latter was conducting an equipment quality analysis which consisted of taking parts from the production line, checking every part in complete detail for trouble in some operation. On occasions plaintiff's specialists would confer with the Boeing engineers on items that plaintiff could not manufacture. Boeing in turn would send a team consisting of persons specializing in materials and purchasing, accounting, cost analysis, manufacturing, tooling and equipment to plaintiff's plant in Portland to work with plaintiff's employees."

■ We agree with the trial court that the activities

of ESCO in Washington amounted to more than solicitation within the meaning of P. L. 86-272. The record discloses that during 1960 and 1961, and for many years prior thereto, ESCO and Boeing had continuously engaged in a complex mutual endeavor to provide Boeing with a large variety of specially designed and precisely engineered and manufactured parts for the airplanes manufactured by Boeing. This mutual endeavor included fairly regular meetings and consultations between the personnel of both companies, principally in Seattle, but also in Portland. There was an almost constant interchange and pooling of talents, resources and expertise in the engineering, manufacturing, installation and testing of the parts furnished by ESCO. In our view, the relationship between the parties involved far more activity than the mere solicitation of orders.

The evidence further indicates that ESCO furnished parts to Boeing pursuant to contracts negotiated and executed in Seattle, and that no orders within the meaning of P. L. 86-272 were sent from Seattle to Portland for approval or rejection. Mr. Wright, the former general manager of ESCO's aircraft division, testified as follows:

"Q Mr. Wright, on this contract negotiation were the orders, after you were up there talking to these people, were the orders then sent from Boeing down to Portland?

"A The formal order was, we would have a negotiation there and they would type out a letter, purchase order number so and so, this part, this price, this delivery schedule, it would all be typed out in a—assigning the purchase order number, defining the work, defining the price and the schedule and the Boeing men would sign it and I would sign it and then the buyer would issue purchase orders in accordance with this document, well, immediately

following, as fast as they could, but those larger ones were always on a letter in the Boeing plant and they would type it up while we were there."

However, it is not necessary to rest our decision on this latter ground; we prefer to rest it on the ground that ESCO's activities in Washington amounted to more than solicitation.

The decree of the tax court is affirmed.