## No. 25409

**Union Pacific Railroad Company, a Utah corporation v. John H. Heckers, The Director of Revenue, now known as the Executive Director of the Department of Revenue**

(509 P.2d 1255)

Decided May 7, 1973.  Rehearing denied May 29, 1973.

Gorsuch, Kirgis, Campbell, Walker and Grover, James H. Turner, Stephen A. Weinstein, E. Shannon Jennings, Knowles, Hopper and Molen, Clayton D. Knowles, Daniel S. Morrison (of the New York Bar) for plaintiff-appellant.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, John E. Bush, Deputy, Bernard S. Kamine, Assistant, for defendant-appellee.

MR. JUSTICE GROVES delivered the opinion of the Court.

This case concerns the amount of Colorado state income tax payable by the Union Pacific Railroad Company for the year 1965. The issues relate to the proper method of deduction of *ad valorem* and other taxes paid by Union Pacific in the computation of its net income derived from Colorado sources. The Colorado Director of Revenue (herein called director) made a determination that Union Pacific owed an additional sum of $24,361.36, including interest and penalties. Union Pacific appealed to the district court, which affirmed the director's determination. We affirm.

Union Pacific operates in 13 states, including Colorado.

The provisions of the Colorado income tax law which are

applicable to this case have remained relatively unchanged since 1937. They provide that an income tax is imposed upon ñet income "derived from sources within Colorado," including "income from tangible and intangible property located or having a situs in this state and income from any activities carried on in this state, regardless of whether carried on in intrastate, interstate, or foreign commerce."[1] They also provide that, where a corporation's gross income is derived from property located and business transacted in part within and in part without Colorado, where practicable direct allocation of such income may be made, together with the applicable deductions.[2]

After making provision for allocation of certain types of income, the statute provides that the remainder of income from sources both within and without Colorado shall be subject to a formula in order to determine the portion derived from sources within the state.[3] One-half weight in the formula is given to the ratio of the real property and tangible property of Union Pacific situated within Colorado to all of its real property and tangible personal property. The other half weight is given to the ratio of gross receipts assignable to Colorado and all gross receipts. One-half of the formula is applied to one-half of the applicable overall net income; and the other half of the formula is applied to the remaining half of such net income. The sum of the results from the two applications becomes the Colorado net income.

Among deductions permitted by statute are "[t]axes paid during the taxable year" (with certain exceptions).[4]

In 1944 the director and Union Pacific entered into a "Memorandum of Understanding" (herein called Memorandum) relating to income tax returns for 1939 and subsequent

[1] 1965 Perm. Supp., C.R.S. 1963, 138-1-35.

[2] C.R.S. 1963, 138-1-28.

[3] 1965 Perm. Supp., C.R.S. 1963, 138-1-37(2).

[4] C.R.S. 1963, 138-1-12.

years. This document provided: "The State and County taxes shall be allowed as directly allocable items of expense to specific states where imposed." As a result, the net income derived from Colorado sources for the year 1939 and subsequent years were computed by (1) arriving at an overall net income figure without deduction of Colorado taxes; (2) application of the formulary percentages to determine Colorado net income; and (3) deduction of the Colorado taxes from the Colorado net income to reach Colorado taxable income.

By statute effective July 1, 1965, the director was given authority to adopt rules and regulations. 1965 Perm. Supp., C.R.S. 1963, 138-9-11(1). Pursuant to this statute he prepared regulations which provided, *inter alia,* that "all prior agreements existing under former rules, regulations, or bulletins must be reaffirmed or will be invalid." The director complied with the Administrative Code in preparing and publishing these rules. C.R.S. 1963, 3-16-2. The rules were adopted, the Memorandum was not reaffirmed, and thus, according to the director, the Memorandum was cancelled.

In 1965 Union Pacific paid $1,200,000 in Colorado state and local taxes (except income taxes), for convenience all of which state and local taxes we will call *ad valorem* taxes, although actually some other taxes were included.[5] In computing its 1965 Colorado income tax return, Union Pacific showed net system-wide income at $76,034,000. In reaching this figure it did not deduct $21,145,000 paid in all states as *ad valorem* taxes. To the $76,034,000 figure it applied the two apportionment factors of 3.19078% and 4.10446%, reaching $2,773,000 as the net income derived from sources within Colorado. From this figure it subtracted the $1,200,000 Colorado tax item, leaving $1,573,000 as Colorado taxable income.

The director claimed — and claims — that the 1965 tax

---

[5] These others were taxes on auto licenses, motor vehicles, sales and use and gross ton-mile, together with P.U.C. fees and state license to do business.

should have been determined as follows: Before the apportionment factors were applied to the system-wide income of $76,034,000, the overall tax figure of $21,145,000 should be deducted. After the application of the apportionment formula, the taxable net income to be allocated to Colorado becomes $2,100,000, in contrast to Union Pacific's figure of $1,573,000. Stated another way, the application of the formulary percentages to all taxes, including those paid in Colorado, results in a deduction of only $729,000 of Colorado *ad valorem* taxes, leaving the remaining $471,000 for deduction, as permitted in other states, against the income not derived from Colorado sources. To put it in still another context, it is apparent that, applying the apportionment factor, the Colorado *ad valorem* taxes were more than those of the other states in which Union Pacific operated.

I.

Union Pacific believes that the statute requires the deduction of Colorado *ad valorem* taxes from computed net income derived in Colorado. It states that "Colorado *ad valorem* taxes, in view of their inherent nature, are derived from and attributable to Colorado sources, therefore, must be · directly allocated to (*i.e.,* deducted from) Colorado income because [the statutes impose] a tax only 'upon the net income of every corporation derived from sources within this state.' " If this were sound, then by the same token the statute would require the property upon which such *ad valorem* taxes are levied in Colorado to be separately allocated to Colorado rather than — as Union Pacific treats it — includable in the overall property for the computations under the apportional formula. Other items are just as much connected with Colorado as are *ad valorem* taxes. An interstate business would not seem to have the right to select an item that will give it an advantage, to the exclusion of other items which will not give such an advantage.

Union Pacific has urged very strongly upon us *Union Pacific Railroad Company v. State Tax Commission,* 145 Kan. 715, 68 P.2d 1 (1937), and even suggests that this decision was the basis for the 1944 Memorandum. It further

urges as authority *Magnolia Pipeline Co. v. Oklahoma Tax Commission,* 196 Okla. 633, 167 P.2d 884 (1946). We do not find these opinions persuasive and hold that the statute does not require the direct deduction of Colorado *ad valorem* taxes from Colorado net income.

## II.

Union Pacific urges that the director's method of computing the tax imposes an unlawful burden on interstate commerce, and violates the due process and equal protection clauses of the federal and state constitutions. U.S. Const. art. I, § 8(3); U.S. Const. amend. XIV and Colo. Const. art. V. Its basis for this argument is stated as follows:

"(a) that a state cannot project its taxing power beyond its borders,

"(b) that apportionment cannot operate to reach profits not attributable to transactions within the state's jurisdiction,

"(c) that projecting Colorado's taxing powers beyond its borders has never been upheld by the Colorado courts."

█ In this connection, Union Pacific has particularly emphasized *Norfolk and Western Railway v. Missouri Tax Commission,* 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968) and *Hans Rees' Sons v. State of North Carolina,* 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879 (1930). In *Norfolk and Western,* Missouri levied an *ad valorem* tax against the railroad's rolling stock. To ascertain the value of the rolling stock located within Missouri the State Tax Commission applied a mileage formula, which resulted in a finding that 8.2824% of the railroad's entire rolling stock was in Missouri. The railroad showed, however, that only 2.71% of its units actually were in that state and the value of the rolling stock in Missouri was only 3.16% of all rolling stock. The court understandably held that 8.2824% was an unfair and disproportionate percentage. It stated the rule that, in apportioning all interstate business and property for taxation by an individual state, the portion allocated to the state must constitute a fair share of all. It further stated that,

"the States have been permitted considerable latitude in devising formulas to measure the value of tangible property

located within their borders .... such formulas usually involve a determination of the percentage of the taxpayer's tangible assets situated in the taxing State and the application of this percentage to a figure representing the total going-concern value of the enterprise."

North Carolina income tax was involved in *Hans Rees' Sons, supra.* The taxpayer, a New York corporation, had its leather tanning plant in North Carolina. It maintained a warehouse and its principal sales office in New York. Sales were made throughout the country, as well as in Canada and Europe. It was determined by the state trial court that the average income having its source in manufacturing and tanning operations in North Carolina was 17%. In contrast, North Carolina's Commissioner of Revenue allocated approximately 80% of all income to North Carolina for purposes of the tax. The United States Supreme Court in effect held that the taxpayer's business was unitary; and further, it held that many jurisdictions were entitled to tax the taxpayer's income attributable to transactions occurring within their jurisdictions. The allocation of the tax by North Carolina's Commissioner of Revenue was ruled, quite rightly, to be unreasonable and arbitrary.

██ The situation in the instant case is quite in contrast to that presented in *Norfolk and Western, supra,* and *Hans Rees' Sons, supra.* Union Pacific would allocate 3.56% of its apportionable income to Colorado. The director would allocate less than 3.65%. As previously stated, we do not believe that Union Pacific used the correct method of computation. If we assume *arguendo,* however, that it has used the correct formula, a difference of .09% is simply too small to constitute an unlawful burden upon interstate commerce, a violation of due process or a violation of equal protection.

██ When there must be an apportionment of unitary income between the states, it is perfectly obvious that there cannot be an *exact* determination of the income derived from any particular state. As stated in *Butler Bros. v. McColgan,* 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942), a method

of allocation is valid if it is fairly calculated to assign to a state that portion of the net income "reasonably attributable" to the business transacted in that state. A further statement from *Butler Bros.* was quoted in *John Deere Plow Co. v. Franchise Tax Board,* 38 Cal. 2nd 214, 238 P.2d 569 (1951):

"[W]here a business is unitary in character, so that its separate parts cannot be fairly considered by themselves and the whole business in the several states derives a value from the unity of use, allocation of income upon a reasonable formula is properly sustained."

We uphold the trial court's conclusion that there was no violation of the constitutional rights asserted here.

### III.

Throughout its briefs, Union Pacific has argued that the director should not have cancelled the Memorandum. The following reasons are given for this argument: (1) The Memorandum was correct and the later method employed by the director was wrong; (2) the director abused his discretion; (3) the statutes had not changed and, therefore, the director could not change his methods; (4) the trial court's finding and conclusion that the director's action was not illegal was in error; (5) the director in 1944 made an administrative determination which either was required by law or constituted a fair and equitable method, and it should not thereafter be disturbed; (6) and the director has failed to show why the practice followed by him and his predecessors for 25 years was wrong. These arguments are without merit. *See Bennetts, Inc. v. Carpenter,* 111 Colo. 63, 137 P.2d 780 (1943).

■ Union Pacific concedes that it does not have the right as a *contractual* matter under the Memorandum to force the method of computation it desires.

During the oral argument, a member of the court mentioned the rule that, where there has been an administrative interpretation of a statute and the legislature has permitted that interpretation to stand for a long period of time without amendment of the statute, a court can give

weight to the administrative interpretation in making its own interpretation. The briefs contain only a hint as to this rule of law. However, after mention of it in oral argument, counsel urged it upon us.

█ As to administrative interpretations and their effect, it might be said initially that application of this rule by the courts — and even the same courts — is not uniform, even when the statute has been reenacted in the same language while the administrative interpretation remained outstanding. (Our Colorado income tax statutes were reenacted with substantially the same language, so far as is applicable here, after the Memorandum was promulgated and prior to its cancellation.) Sometimes courts give great weight to an administrative interpretation; sometimes they give no weight; and sometimes they criticize the rule. 1 *Davis, Administrative Law Treatise,* § 5.07; *See also* § 5.06.

█ Here, we do not have to depend upon possible vagaries in judicial pronouncements. It is apparent that there was an administrative *determination* that the legislation permitted operation as prescribed in the Memorandum. This did not constitute, however, an administrative *interpretation.* A thorough reading of our statutes shows quite clearly that they could not be interpreted as *requiring* the direct deduction of Colorado *ad valorem* taxes from net income allocable to Colorado. Perhaps the statute *authorized* this method, but we do not reach that question. It would seem, although we do not so decide, that the statutes mentioned earlier in footnote 4 might contemplate the deduction of all taxes from overall income. Certainly, under the wording of that statute, such an administrative *interpretation* could be made. The statute authorizes the method now employed by the director and the fact that earlier he used another method cannot be determinative here.

### IV.

█ We lastly consider the position of Union Pacific that there was a violation of procedural due process by the cancellation of the Memorandum without prior notice directed specifically to it that the Memorandum might be

cancelled. The Memorandum created no contractual responsibility and did not and could not provide for permanency of operation. Colo. Const. art. II, § 11 and art. X, § 9. When the director gave the notice provided by the Administrative Code of a hearing on rules which would abrogate all understandings, such as that of the Memorandum, Union Pacific could not constitutionally or in law ask for more.

Judgment affirmed.

MR. CHIEF JUSTICE PRINGLE does not participate.