No. 26158

**Coors Porcelain Company v. State of Colorado and
John H. Heckers, Director of Revenue**
(517 P.2d 838)

Decided December 10, 1973. Rehearing denied January 28, 1974.

Reardon, Reardon and Reardon, Julie M. Reardon, for plaintiff-appellant.

John P. Moore, Attorney General, John E. Bush, Deputy, Bernard S. Kamine, Assistant, for defendants-appellees.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

As it had done in previous years, for the years 1963 through 1966 the plaintiff (Coors) included in its state income tax returns only the income which it regarded as allocable to Colorado. The Director of Revenue (referred to as the director) assessed income tax for all of Coors income for those years. Coors paid the deficiencies assessed and brought action in the district court to recover them. The court concluded that under an agreed statement of facts the deficiencies had been properly assessed, and dismissed the complaint. Coors appealed to the Court of Appeals and we accepted the case upon petition of the Court of Appeals under 1969 Perm. Supp., C.R.S. 1963, 37-21-10(1)(a). We affirm.

The court concluded that Coors "does no business outside Colorado and has no established business tie outside Colorado." The implied effect of the judgment of dismissal is that the applicable statutes and regulations are valid and that the director correctly proceeded thereunder to collect tax on all of Coors' income.

The material portions of the stipulation of facts read as follows:

"The Coors Porcelain Company sells its manufactured porcelain and ceramic products in the States of Colorado, California, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Michigan, Missouri, New York, Ohio, Oregon, Pennsylvania, Texas, Washington, West Virginia and Wisconsin. It also sells its ceramic and porcelain products in the following foreign countries: Canada, England, France, India and the Netherlands.

"Coors employs sales employees or sales agents for all of the states and foreign countries where their products are sold.

"During the years involved Coors employed approximately ten field sales employees, all of whose titles were Regional Sales Manager. These salesmen are salaried employees. All of these employees reside in and maintain their business offices outside the State of Colorado and in states where Coors products are sold.

"During the years involved Coors employed approximately ten commissioned sales agents. They reside in and maintain their business offices outside the State of Colorado and in states and foreign countries where Coors products are sold.

\* \* \*

"It primarily operates a job shop manufacturing custom items. About 10% of its manufactured products are standard cataloged items . . . .

"Coors requires that their field representatives be technically qualified in the ceramics and porcelain business and prior to employment they must possess educational background and practical experience in this specialized field. These field representatives are further trained by Coors. The field representatives duties and responsibilities are as follows: To

solicit sales from present customers and to develop and acquire new customers; To be fully knowledgeable with respect to all the facets of Coors products in order to be able to demonstrate to present and potential customers the advantages of Coors product over other available products; To design parts for manufacture by Coors which will fit the needs of a particular customer or potential customer; To be able to intelligently discuss with customer engineers the problems they are encountering and to recommend design of Coors products to solve the particular problem involved; To be able to present price-quotations to the customer and negotiate such prices; To follow up after such price-quotation for the purpose of insuring that the potential customers will place their order with Coors; To develop new application for Coors products with present or new customers; To generally develop and maintain a good public relationship with the technical employees and purchasing agents of Coors customers; To maintain all essential records required for field operations including delivery and order records; To discuss with customers any complaints or problems involving the purchased product; To demonstrate to customers how each Coors product operates and explain to them why they should purchase the Coors product.

"Orders are mailed either from the agent or from a customer to Golden, Colorado, from which point the orders are approved and shipped. Some agents buy directly and resell to their customers; some merely solicit the orders from customers and Coors ships directly to the customer and pays a commission to the agent. Prices are established based on production standards determined in its Estimating Department, or by negotiation between the engineering field salesman and the customer and approved by the office in Golden, Colorado. All sales are completed upon delivery to and acceptance by the customer. Most of its manufactured products are custom made as the result of designs submitted by its field representatives.

"Each field representative maintains his own business office in the locality wherein he resides. Coors supplies each field

representative with a business automobile and also places advertisements in the local telephone directory listing the local representative's business telephone. Coors does not consistently maintain warehouses or stocks of products, parts or supplies outside of Colorado, but its out of state representatives do consistently maintain sample materials owned by Coors and on occasion they possess Coors products for shipment to the customer and also retain Coors products which have been rejected by the customer upon delivery."

It is Coors' contention that our statute is being misinterpreted by the director or, if correctly interpreted, the applicable regulation of the Department of Revenue and rulings thereunder to the effect that Coors is not doing business outside of Colorado constitute an unconstitutional interference with interstate commerce.

We mention initially that we are inclined to agree with the statement of the Attorney General that our General Assembly has sought to tax all the income that Colorado can constitutionally tax. Our statute provides as follows:

"A tax is hereby imposed upon each domestic corporation, and foreign corporation doing business in Colorado, annually in an amount equal to five per cent of the net income of such corporation during the year derived from sources within Colorado. Income from sources within Colorado includes income from tangible or intangible property located or having a situs in this state and income from any activities carried on in this state, regardless of whether carried on in intrastate, interstate, or foreign commerce." 1965 Perm. Supp., C.R.S. 1963, 138-1-35.[1]

The statute further provides for the allocation or apportionment to other states in certain instances of receipts of interest from intangible personal property, dividends, gains

---

[1] The taxes involved are for the years 1963 through 1966. Our income tax statutes were repealed and re-enacted in 1964. We here cite the re-enactments. The predecessor statute was C.R.S. 1963, 138-1-1 through 65. So far as this case is concerned, we have not perceived any substantial change by the re-enactment.

and losses, royalties and rents. The statute then states, "If the corporation carries on no business outside of Colorado, the whole or the remainder of the net income shall be allocated to Colorado." A formula is provided for computations of the tax on income derived from sources both within and without Colorado, 1965 Perm. Supp., C.R.S. 1963, 138-1-37.

 Regulation 37 of the Department of Revenue contains criteria for determining whether or not a corporation is doing business in Colorado, and whether or not the portions of its income arising from out-of-state sales are taxable under the Income Tax Act. Regulation 37 provides in part: "The criteria for determining when a corporation is doing business in Colorado shall be the same as for determining when a corporation is doing business out of Colorado."

It has been the rule that a foreign corporation which had "established a commercial domicile" in the state might be taxed by that state on income allocable to that state, and that such taxation would not be an unconstitutional burden upon interstate commerce. *Underwood Typewriter Co. v. Chamberlain,* 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165 (1920). The corollary has been that such taxation upon a corporation which had not established a commercial domicile would unduly burden interstate commerce. As further background, we quote from *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959):

"It has long been established doctrine that the Commerce Clause gives exclusive power to the Congress to regulate interstate commerce, and its failure to act on the subject in the area of taxation nevertheless requires that interstate commerce shall be free from any direct restrictions or impositions by the States. *Gibbons v. Ogden,* 9 Wheat. 1 (1824). In keeping therewith a State 'cannot impose taxes upon persons passing through the state, or coming into it merely for a temporary purpose' such as itinerant drummers. *Robbins v. Taxing District,* 120 U.S. 489, 493-494 (1887). Moreover, it is beyond dispute that a State may not lay a tax on the 'privilege' of engaging in interstate commerce, *Spector*

*Motor Service v. O'Connor,* 340 U.S. 602 (1951). Nor may a State impose a tax which discriminates against interstate commerce either by providing a direct commercial advantage to local business, *Memphis Steam Laundry v. Stone,* 342 U.S. 389 (1952); *Nippert v. Richmond,* 327 U.S. 416 (1946), or by subjecting interstate commerce to the burden of 'multiple taxation,' *Michigan-Wisconsin Pipe Line Co. v. Calvert,* 347 U.S. 157 (1954); *Adams Mfg. Co. v. Storen,* 304 U.S. 307 (1938). Such impositions have been stricken because the States, under the Commerce Clause, are not allowed 'one single-tax-worth of direct interference with the free flow of commerce.' *Freeman v. Hewit,* 329 U.S. 249, 256 (1946).

"On the other hand, it has been established since 1918 that a net income tax on revenues derived from interstate commerce does not offend constitutional limitations upon state interference with such commerce. The decision of *Peck & Co. v. Lowe,* 247 U.S. 165, pointed the way. There the Court held that though true it was that the Constitution provided. 'No Tax or Duty shall be laid on Articles exported from any State,' Art. I, § 9, still a net income tax on the profits derived from such commerce was not 'laid on articles in course of exportation or on anything which inherently or by the usages of commerce is embraced in exportation or any of its processes .... At most, exportation is affected only indirectly and remotely.' *Id.,* at 174-175, . . ."

In *Northwestern States Portland Cement Co., supra,* the foreign corporation operated an office within the taxing state, and one or more salesmen actively solicited orders within the state for the purchase of the corporation's products. Such orders were subject to acceptance, filling and delivery at the corporation's principal office located in another state. It was held that the taxing state could collect an income tax on that portion of the net income reasonably attributable to the corporation's business activities within that state. Later that year Congress enacted P.L. 86-272, 73 Stat. 555, 15 U.S.C. § 381. This statute fixed minimum standards of business activity for a foreign corporation under which the state could not tax any portion of the corpora-

tion's income. It provided in part that a corporation could not be taxed if its only business activities within the state were either, or both, of the following:

"(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and

"(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1)."

To show the reason for and effect of the federal statute, we quote from *Heublein, Inc. v. South Carolina Tax Commission*, 409 U.S. 275, 93 S.Ct. 483, 34 L.Ed.2d 472 (1972):

"The impetus behind the enactment of § 381 was this Court's opinion in Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959). There we held that 'net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same.' 358 U.S., at 452, 79 S.Ct., at 359. Congress promptly responded to the 'considerable concern and uncertainty' and the 'serious apprehension in the commercial community' generated by this decision by enacting Pub.L.No. 86-272, 73 Stat. 555, 15 U.S.C. § 381, within seven months.

"In this statute, Congress attempted to allay the apprehension of businessmen that 'mere solicitation' would subject them to state taxation. Such apprehension arose because, as businessmen who sought relief from Congress viewed the situation, *Northwestern States Portland Cement* did not adequately specify what local activities were enough to create a 'sufficient nexus' for the exercise of the State's power to

tax. Section 381 was designed to define clearly a lower limit for the exercise of that power." (footnotes omitted.)

I.

The director uses this federal statute as a guideline, but, as is to be observed from the above quoted regulation, it is turned around. The statute relates to doing business by a foreign corporation within a state, whereas the regulation provides in effect that, if under this statute a foreign corporation is not doing business in a state, then the income attributable to that state is taxable by the state in which the corporation is domestic.

■ Coors contends that the federal statute relates only to standards applicable to a foreign corporation, and that the corollary cannot be used as standards for taxable income by the state in which the corporation is domestic. Therefore, says Coors, *Northwestern States Portland Cement Co. v. Minnesota, supra,* is applicable and, under the stipulated facts, Colorado cannot tax income attributable to other states. We disagree and hold that the statute may be used in a correlative manner as the regulation provides. No unconstitutionality has been demonstrated to us.

There have been cited and we have read *Hervey v. AMF Beaird, Inc.,* 250 Ark. 147, 464 S.W.2d 557, (1971); *Hawes v. William L. Bonnell Co.,* 116 Ga. App. 184, 156 S.E.2d 536 (1967); *Tonka Corporation v. Commissioner of Taxation,* 284 Minn. 185, 169 N.W.2d 589 (1969); *Iron Fireman Manufacturing Company v. State Tax Commission,* 251 Or. 227, 445 P.2d 126 (1968); *Herff Jones Co. v. State Tax Commission,* 247 Or. 404, 430 P.2d 998 (1967); *Cal-Roof Wholesale, Inc. v. State Tax Commission,* 242 Or. 435, 410 P.2d 233 (1966); *Commonwealth v. Hellertown Manufacturing Co.,* 438 Pa. 134, 264 A.2d 382 (1970); and *Wisconsin Department of Taxation v. Blatz Brewing Co.,* 12 Wis. 2d 615, 108 N.W.2d 319 (1961). These cases involve either circumstances beyond the solicitation of orders or are distinguishable by reason of difference in statutes, or both. Coors has emphasized *General Motors v. Colorado,* 181 Colo. 360, 509 P.2d 1260 (1973), which at the time the briefs were

written was pending on appeal. The issues involved here were not raised in that case.

## II.

Coors does not seriously contend that under the federal statute it is doing business in a tax sense in states other than Colorado. Rather, it is argued that the statute applies to foreign corporations and cannot be applied to domestic corporations. We have already disposed of that argument.

 Nevertheless, we must rule on whether Coors was "doing business" outside the state. The question may be distilled to an inquiry of whether or not Coors went beyond the solicitation of orders in its out-of-state business. It is implicit in the trial court's ruling that it concluded that Coors' out-of-state business did not extend beyond solicitation of orders. We reach the same conclusion.

From the stipulated facts, the only possible extension by Coors' out-of-state representatives beyond the solicitation of orders is the statement that "on occasion they possessed Coors products for shipment to the customer and also retained Coors products which have been rejected by the customer by delivery." It appears that these acts are not in common practice and are the exception rather than the rule. Otherwise, we can assume that Coors would have seen to it that the stipulation demonstrated that these acts were not exceptional and were in the course of regular practice.

## III.

An assistant attorney general in oral argument expressed the opinion that the stipulation of facts is not sufficiently complete and definitive, and that we should remand the matter to the trial court for a hearing to further develop the facts.[2] Coors, however, is satisfied with the stipulation and wants the case determined on the agreed facts. Certainly, the Department of Revenue is bound by its stipulation and we have no right to remand for further hearing absent the

---

[2] Another assistant attorney general participated in the preparation of the stipulation.

consent of Coors. If Coors changes its mind in this respect, it can so indicate in its petition for rehearing.

IV.

█ Coors has emphasized that for the years prior to 1963 it uniformly was permitted to allocate Colorado and out-of-state income. We held in *Union Pacific R.R. Company v. Heckers*, 181 Colo. 374, 509 P.2d 1255, announced earlier this year, that the director may change methods of allocation. The same rule applies here.

Judgment affirmed.

MR. JUSTICE KELLEY did not participate.