CONLEY, J. T. C.
Plaintiff Rocappi, Inc., has appealed from a final determination of the Director of the Division of Taxation imposing a tax under the Corporation Business Tax Act of 1945, N.J.S.A. 54:10A-1 et seq.[1] Plaintiff argues that the Director improperly denied plaintiff the right to apportion part of its net income to other states, a reporting procedure by which plaintiff would *313 have reduced its tax base allocable to New Jersey by more than 20%.
Plaintiff is a Pennsylvania corporation doing business in New Jersey. Its corporate headquarters are in Pennsauken, New Jersey, where its computer and other equipment are located. It is in the business of silk screen printing and computerized typesetting, and it manufactures multicolored textbook covers. All of plaintiff’s commercial printing is done in and shipped from New Jersey where decisions to accept or to reject orders are made. Plaintiff is a subsidiary of the Lehigh Press, Inc. Lehigh Press is also a Pennsylvania corporation and it and its seven subsidiaries are collectively known as the Lehigh Graphics Group. The parent and all subsidiaries specialize in certain aspects of the printing business.
Plaintiff’s witness, Louis Muracco, testified that prior to 1973 Rocappi had its own salesmen and that these salesmen sometimes made sales for other subsidiaries of Lehigh Press. When this occurred, the particular subsidiary for which the sale was made paid the salesman a commission. Thus, prior to 1973 Rocappi paid commissions to its own salespeople only when the sale was made for the benefit of Rocappi. In 1973 Lehigh Press put into effect a new sales concept which involved the formation of a corporate sales group. The purpose of this group was to market all of the services offered by Lehigh Press and its subsidiaries. To that end the group operated a sales office in Palo Alto, California, beginning in 1973, and a sales office in Boston, Massachusetts, beginning in 1974. Both sales offices continued to exist through 1975.
In 1973 the sales office in California was staffed by a man named Harold Nesbitt who was the first salesman to operate under the corporate group sales concept. Nesbitt and his successor sold services and products for all of the entities in the Lehigh Press Group. When he sold something on behalf of Rocappi, Rocappi paid a preset “parent company commission” to Lehigh Press. All of the other subsidiaries did the same when something was sold for them. The parent company commission *314 consisted of a percentage of any specific sale and was intended to include not only the remuneration of the salesman but also payment of expenses associated with a particular sale. The expenses paid encompassed rental of office space, purchase of office supplies and payment of certain payroll taxes. Expenses were apportioned among the subsidiaries based upon the volume of sales made for each entity. After parent company commissions had been calculated and paid, a monthly salesman’s profit and loss statement was prepared. The amount of the parent company commissions represented the income figure on this statement. From the income figure, all expenses built into the parent company commissions were subtracted, including office, salary, payroll tax and benefits. The result was referred to as disposable income, 20% of which was retained by corporate headquarters to defray any costs of those groups not covering their costs. Of the remaining 80% of the disposable income, 20% went to the manager of the particular sales office and the rest was distributed among the other salesmen in that office. Since the Palo Alto office was staffed with only one person at the time, that person received 80% of the disposable income. Muracco testified that the initial expense for opening the California office was borne by the parent company, Lehigh Press, which had no products or services itself to sell. After initial expenses, all costs were covered by parent company commissions unless disposable income on the profit and loss statement was actually a disposable loss. When a disposable loss occurred the parent company covered the loss by use of disposable income kept from other parent company commissions.
Plaintiff’s salesman Nesbitt did not keep regular hours at the California office, although he lived in California. His successor in 1975 did not live in California and spent only about one week each month at the California office. The office had an answering service to take messages when the salesmen were not there. Plaintiff’s Boston office was operated in much the same way as the California office, both of which were located in office buildings. However, the Boston office had three salesmen and a full-time secretary. The phone number for both offices was in *315 the name of Lehigh Press. The name Lehigh Press appeared on the floor directories of both the California and Massachusetts office buildings; the name Rocappi did not appear on the building exteriors, the floor directories or the office doors. Nesbitt’s employment contract was with Lehigh Press and business cards carried by Nesbitt identified him as a salesman for “The Lehigh Graphics Group,” although the name of Rocappi appeared on the back of the card along with the names of the other group members.
Muracco testified that the salesmen were often out of their offices calling on potential customers, but customers also visited the offices on occasion. Each office was furnished with promotional literature and work samples from all of the subsidiaries and each salesman was trained by each subsidiary so that he was familiar with their various services and products. Although Lehigh Press hired all of the office managers, who in turn hired other personnel for each office, the subsidiaries had some influence on hiring, firing and job performance ratings.
During the years in issue Rocappi paid corporate franchise tax to California based upon apportionment to California of less than 2% of its income. In its California tax returns Rocappi reported no inventory, buildings, machinery, equipment, furniture, fixtures, delivery equipment or other tangible assets as being owned or rented by it in California. It also reported no wages, salaries, commissions or other compensation for employees within California. Rocappi was not qualified to do business in Massachusetts and paid no taxes there. On its New Jersey tax returns for 1973, 1974 and 1975 Rocappi reported that it had one out-of-state place of business.
Plaintiff contends that it maintained regular places of business in California and Massachusetts during the years in question. It argues that pursuant to N.J.S.A. 54:10A 6 it should be able to apportion part of its net income to those states for franchise tax purposes. Plaintiff further contends that if it cannot take advantage of the apportionment provision found in N.J.S.A. 54:10A-6, New Jersey’s franchise tax would be imposed *316 on net income susceptible to franchise taxation elsewhere. Plaintiff contends that this multiple taxation, or the possibility of multiple taxation, is prohibited by the Commerce Clause. The issues presented by this litigation, therefore, are whether plaintiff maintained regular places of business outside of New Jersey within the meaning of N.J.S.A. 54:10A-6 during the years at issue and, if not, whether plaintiff’s inability to apportion some of its net income to California and Massachusetts for franchise tax purposes is violative of the Commerce Clause.
The corporation business tax applies to domestic and foreign corporations “for the privilege of having or exercising their corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.” N.J.S.A. 54:10A-2. The tax is computed by adding together prescribed percentages of a taxpayer’s net worth and net income. N.J.S.A. 54:10A-5.
N.J.S.A. 54:10A-6, the statute at issue in the present case, provides that a taxpayer “which maintains a regular place of business outside this State other than a statutory office” may allocate as much of its net worth and its net income as applies to these regular places of business outside New Jersey. The statute further provides for a method of calculating an “allocation factor”;to be used in conjunction with the formula found in N.J.S.A. 54:10A-6. However:
In the case of a taxpayer which does not maintain a regular place of business outside this State other than a statutory office, the allocation factor shall be 100%.
Thus, if plaintiff in the present case did not maintain a regular place of business outside of New Jersey, it must allocate 100% of its net worth and net income to New Jersey for purposes of franchise taxation. The initial issue, therefore, is what constitutes a “regular place of business.”
In N.J.A.C. 18:7-7.2(a) the Director of the Division of Taxation has defined “regular place of business” as follows:
A regular place of business is any bona fide office (other than a statutory office), factory, warehouse, or other space of the taxpayer which is regularly maintained, occupied and used by the taxpayer in carrying on its business and in which one or more regular employees are in attendance.
*317 In the present case defendant contends that since plaintiff did not itself “regularly maintain” the offices in California and Massachusetts and since the salesmen in both offices were not regular employees of plaintiff, plaintiff cannot allocate any part of its net worth or net income to California or Massachusetts. Defendant further argues that the operations in California and Massachusetts should not even be considered as “offices” within the meaning of the above rule, since plaintiff failed to establish that they met the definition set forth in the Director’s regulation.
In response, plaintiff states that a regulation like a statute must be interpreted with an eye toward effectuating the Legislature’s intent. Although plaintiff admits that employees were not always “in attendance” at the California office, it contends that this requirement was merely gloss placed upon the statute by the Director as a result of a policy decision and that the Director’s gloss is inconsistent with legislative intent.
In Hoeganaes v. Director of Division of Taxation, 145 N.J.Super. 352, 367 A.2d 1182 (1976), the Appellate Division of the New Jersey Superior Court construed the meaning of the words “maintain a regular place of business outside this State.” In that case, a company which maintained its principal office and factory in New Jersey wished to allocate part of its net worth and net income to six states where it had located sales engineers to service customers’ complaints, receive orders and assist in the solution of customers’ manufacturing problems. These engineers were full-time, regular employees of the company, but the company required them to have space available in their homes from which business could be conducted. Other pertinent facts were as follows:
(1) the company provided each engineer with necessary office supplies;
(2) the engineers established contact with customers from their homes;
(3) telephones were often listed under the name of the company, but were personal telephones for which the company paid only business-related charges;
(4) orders were received at the engineers’ homes and forwarded to the home office;
*318 (5) the engineers spent only 20% to 25% of their time at their “home” offices, but telephones were covered by answering services, recording devices, or members of an engineer’s family;
(6) the activities of the engineers were managed and controlled from the company’s New Jersey office where all orders were approved and accepted;
(7) all face-to-face contact with customers occurred at the customers’ location, but the engineers could deduct the expense of using their homes as offices for federal income tax purposes;
(8) the company did not enter into leases nor did it make any rental payments on behalf of the engineers;
(9) no part of an engineer’s salary was designated as being payment in lieu of rent, and
(10) the company paid no state income or franchise taxes to any other state.
In view of these facts, the Division of Tax Appeals had found that since the engineers were agents of the company, occupancy and use of the home offices by the engineers in the course of employer business was the same as occupancy and use by the company. The court rejected this view as a purely subjective test not justified by anything stated in N.J.S.A. 54:10A-6 and N.J.A.C. 18:7-7.2(a). The court thus weighed the evidence to determine if, in an objective sense, plaintiff’s relationship with its engineers amounted to maintaining a “regular place of business” as generally defined by the regulation.
In holding that plaintiff’s relationship with its engineers did not amount to maintaining a regular place of business, the court found that the “offices” were merely spaces in the engineers’ apartments or homes. Use of the space was at the whim and determination of the employee, who selected the area, the size, the decoration and the location of the space. The employee was responsible for repairs and for rent, and personal telephones were used for business. No signs existed outside to inform persons of the presence of an office, and, in many cases, zoning regulations may have even prohibited “offices” in the areas where the homes were located. On the basis of these facts the court concluded:
A regulation, like a statute, of necessity must be general. The drafters could not possibly anticipate every factual situation. Therefore, because they did not specify that the rent must be paid by the taxpayer or that the taxpayer must own the premises is not of any moment. The language sufficiently conveys to the reader a concept which covers the situation sufficiently — “regularly main *319 tained” and “occupied and used by the taxpayer” and “regular employees in attendance” imply a place which to the ordinary person is more than a location where an employee writes up reports in his own home, [at 360, 367 A.2d 1182]
In the present case, although the facts are somewhat different, the same result must follow. Even though plaintiff can with some justification make an argument that the offices in California and Massachusetts resembled regular places of business as that phrase is generally understood, defendant, on the other hand, by emphasizing different factors, argues with greater force that the offices were not regular places of business, especially since plaintiff admitted that employees were not always in attendance, at least in the California office. However, even assuming that plaintiff’s argument with regard to a regular place of business has some validity, the fact that plaintiff did not control the premises undermines its position substantially. For example, it is clear that all arrangements for the “offices” in California and Massachusetts were made by Lehigh Press, Rocappi’s parent company. Although Rocappi had some involvement in the operation of the offices — for instance, it provided some training for the salesmen — most of its involvement was indirect. Thus, in no true sense of the words can Rocappi itself be said to have “regularly maintained” the California and Massachusetts offices, as required by the Director’s regulation.
As stated above, however, plaintiff argues that the regulation is inconsistent with the intent of the statute and that the gloss placed upon the statute’s meaning by the Director should not be binding upon the court. In essence, plaintiff argues that Rocappi’s indirect involvement by way of the “corporate group sales concept” should be equated with maintaining a regular place of business. If accepted, this argument would have the effect of applying the subjective test which the court in Hoeganaes expressly rejected, and in support of its position plaintiff cites the dissent in that case which urged that the opinion of the Division of Tax Appeals be adopted in full.
In his dissent in Hoeganaes Judge Matthews cited the fact that the engineers were full-time employees and that the nature *320 of their work required them to spend 80% of their working time away from their “offices.” Further, he noted that the engineers serviced the needs of customers who generated “all but $186,000 of approximately $12 million of sales in the United States; the former figure representing New Jersey sales.” Id. at 363, 367 A.2d 1182. In view of these facts, he concluded as follows:
Unquestionably, petitioner could satisfy the director by renting a room in an office building at each location and by hiring a telephone answerer to be present therein for an eight-hour day at minimal expense. That this is so satisfies me of the lack of merit in the director’s argument, [at 363, 367 A.2d 1182]
Judge Matthews thus felt that even if the “home offices” of the engineers did not objectively resemble “regular places of business,” they did so subjectively since a major part of the company’s business was conducted through them. Plaintiff in the present case urges the court to adopt this view even as to the question of who controlled the California and Massachusetts operations.
Other than the above dissent, plaintiff cites no New Jersey cases in support of its position. It does cite a line of Pennsylvania cases, some of which are also cited by the majority in Hoeganaes and by defendant in the present case, but these cases do not necessarily stand for the proposition that the meaning of “regular place of business” should be viewed subjectively. Rather, they indicate some of the factors which should be considered in making a determination as to whether or not a taxpayer has maintained an out-of-state business, and the court in Hoeganaes treated these cases in that way. See Hoeganaes, supra at 360-62, 367 A.2d 1162.
The holding of the majority in the Hoeganaes case clearly controls the present case. Accordingly, an objective test should be applied to resolve the question of whether Rocappi may treat the California and Massachusetts offices as regular places of business outside of New Jersey. As stated above, although some factors favor plaintiff’s position, most factors weigh against plaintiff. Objectively viewed, the operations did not resemble regular places of business as that phrase is generally understood, and even if they did, they were not regularly *321 maintained, occupied and used by plaintiff. Plaintiff’s involvement with the California and Massachusetts “offices” was indirect since Lehigh Press made all of the arrangements. I conclude that such a situation cannot be viewed by the ordinary person as being indicative of a regular place of business maintained by Rocappi.
Plaintiff argues that a violation of the Commerce Clause necessarily results if plaintiff is not allowed to make use of the apportionment provisions set forth in N.J.S.A. 54:10A-6. In making this argument plaintiff does not attack the constitutional validity of New Jersey’s formula for apportionment. Rather, plaintiff argues that use of the “regular place of business” test is unconstitutional as a criterion for determining whether a corporation should be permitted to apportion its net worth and net income for purposes of franchise taxation.
The validity of plaintiff’s Commerce Clause argument must be determined in light of several United States Supreme Court decisions. In Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959), the court considered a situation in which Minnesota levied a net income tax on an Iowa corporation whose activities in Minnesota consisted solely of regular solicitation of orders for the sale of its products. The orders were accepted, filled and delivered from Iowa, but the corporation leased a sales office in Minnesota that was staffed by two salesmen and a secretary. The Minnesota Commissioner of Taxation assessed an apportioned net income tax based on application of a three-part formula similar to the formula used in New Jersey. Id. at 453-454, 79 S.Ct. at 359-360. The corporation did not challenge the fairness of the apportionment but rather maintained that a violation of the Commerce Clause and Due Process Clause had occurred. The court rejected the corporation’s argument.
The court first noted that the Commerce Clause gives Congress the power to regulate interstate commerce and that a state may not impose a tax which discriminates against interstate commerce either by providing a direct commercial advan *322 tage to local business, Memphis Steam Laundry Cleaner, Inc. v. Stone, 342 U.S. 389, 72 S.Ct. 424, 96 L.Ed. 436 (1952), or by subjecting interstate commerce to the burden of “multiple taxation,” Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583 (1954). However, the court further recognized that interstate commerce should carry “its fair share of the costs of state government in return for the benefits it derives from within the State,” 358 U.S. at 462, 79 S.Ct. at 364, and that use of an apportionment formula met the requirement that the tax be “a constitutionally fair demand by the State for that aspect of the interstate commerce to which the State bears a special relation.” Central Greyhound Lines v. Mealey, 334 U.S. 653, 661, 68 S.Ct. 1260, 1265, 92 L.Ed. 1633 (1948), as quoted in Northwestern States Portland Cement Co., 358 U.S. at 462, 79 S.Ct. at 364. After noting that the taxpayer’s sales activities had a sufficient nexus with Minnesota to satisfy the requirements of due process, the court upheld the Minnesota tax as constitutional. It did not deal with the problem of multiple taxation, since that issue, although raised, was not squarely before the court, but it did state:
Logically it is impossible, when the tax is fairly apportioned, to have the same income taxed twice. In practical operation, however, apportionment formulas being what they are, the possibility of the contrary is not foreclosed, especially by levies in domiciliary States. But that question is not before us. [id. at 462-463, 79 S.Ct. at 364-365]
The court found that the mere possibility of multiple taxation was an abstraction with which it could not deal. Id. at 463, 79 S.Ct. at 365.
In the present case the facts are very similar to those of Portland Cement, even as to the tax imposed by California and as to the possibility of taxation by Massachusetts. The present case differs, however, in that the domiciliary state, New Jersey, is the jurisdiction whose tax statute has been challenged. Portland Cement has application because it dealt with the issue of whether a nondomiciliary state could tax income generated within its borders by a corporation’s interstate activities. Consideration of this issue and of its ramifications is central to plaintiff’s case, since Rocappi maintains that two nondomiciliary *323 states, California and Massachusetts, were capable of imposing taxes on the same basis as New Jersey and that this alleged multiple taxation, or the possibility of this multiple taxation, resulted in a violation of the Commerce Clause.
It is not unconstitutional per se for a state to tax business which is exclusively interstate in its operations. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). A fairly apportioned state tax on such a business is permitted because “a State has a significant interest in exacting from interstate commerce its fair share of the cost of state government.” Washington Rev. Dep’t v. Stevedoring Ass’n, 435 U.S. 734, 748, 98 S.Ct. 1388, 1398, 55 L.Ed.2d 682 (1978). Thus, all tax burdens do not impermissibly impede interstate commerce. The Commerce Clause balance tips against the tax only when it unfairly burdens commerce by exacting more than a just share from the interstate activity. The inquiry in the present case must therefore revolve around whether application of the “regular place of business” test by New Jersey results in an undue burden on interstate commerce.
Congress has at least partially indicated what constitutes an undue burden on interstate commerce. In the year that Portland Cement, supra, was handed down, Congress enacted P.L. 86-272, 73 Stat. 555, 15 U.S.C.A. § 381, which states in pertinent part:
(a) No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph d).
*324 The Supreme Court reviewed the legislative history of 15 U.S.C.A. § 381 in Heublein v. South Carolina Tax Comm’n, 409 U.S. 275, 93 S.Ct. 483, 34 L.Ed.2d 472 (1972):
The impetus behind the enactment of § 381 was this Court’s opinion in Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959). There we held that “net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same.” 358 U.S., at 452, 79 S.Ct., at 359. Congress promptly responded to the “considerable concern and uncertainty” and the “serious apprehension in the commercial community” generated by this decision by enacting Pub.L. 86-272, 73 Stat. 555, 15 U.S.C. § 381 [15 U.S.C.S. § 381] within seven months.
In this statute, Congress attempted to allay the apprehension of businessmen that “mere solicitation” would subject them to state taxation. Such apprehension arose because, as businessmen who sought relief from Congress viewed the situation, Northwestern States Portland Cement did not adequately specify what local activities were enough to create a “sufficient nexus” for the exercise of the State’s power to tax. Section 381 was designed to define clearly a lower limit for the exercise of that power. [Id. at 279-280, 93 S.Ct. at 486-487; footnotes omitted]
The court in Heublein found that a transfer of goods by a corporation’s representative in South Carolina to a distributor constituted activity which went beyond activity protected by § 381, and the South Carolina Tax was upheld.
In making its arguments before this court, Rocappi suggests that it has a liability to California and Massachusetts for franchise tax. However, the proofs do not convince this court of that liability. Plaintiff’s complaint in this case states:
Rocappi has regularly filed income and/or franchise tax returns in those states in which it considered itself liable for such taxes because of having in those states a regular place of business and employees.
Aside from asserting its belief that taxes may have been due and owing, plaintiff provided little support for its argument that multiple taxation would result by application of New Jersey’s “regular place of business” test.
It is a well-established principle that when a taxpayer challenges the fairness of an apportionment formula, he or she must show that the formula pláces an undue burden upon interstate commerce in a constitutional sense. Portland Cement, supra 358 U.S. at 463, 79 S.Ct. at 365; Moorman Mfg. Co. *325 v. Bair, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978). The same principle must be applied here where a taxpayer is challenging the “regular place of business” test because, in effect, the argument is the same — that is, that application of the test places an undue burden upon interstate commerce.
There is some support for the principle that the mere risk of multiple taxation establishes a violation of the Commerce Clause. Mobile Oil Corp. v. Commissioner of Taxes, 445 U.S. 425, 444, 100 S.Ct. 1223, 1235, 63 L.Ed.2d 510 (1980). See, also, Hellerstein, “State Income Taxation of Multijurisdictional Corporations,” 79 Mich.L.Rev. 113, 131-35 (1980). However, there were no proofs in this case with regard to Rocappi’s tax liability to Massachusetts. It is undisputed that Rocappi paid no franchise tax to Massachusetts and filed no corporation tax returns there. Rocappi was not qualified to do business in Massachusetts and did not indicate on its New Jersey tax returns that it had a place of business in Massachusetts. Plaintiff did not show that it was engaged in anything more in Massachusetts than nontaxable solicitation, so that its activities there, as disclosed by this record, could hardly result in a risk of taxation by that state.
Much the same may be said of Rocappi’s activities in California. Although some franchise tax was actually paid to that state, the evidence presented in this court established neither that Rocappi was involved in more than nontaxable solicitation in California nor that there were other overriding considerations, such as the state’s interest in regulating the liquor industry involved in Heublein, that might have supported a corporate franchise tax by that state. The only evidence introduced by Rocappi relevant to this issue was its tax returns indicating that it had paid $2,064 in franchise taxes to California for 1973, 1974 and 1975. These returns do not in themselves establish multiple taxation or even the possibility of multiple taxation within the meaning of the Commerce Clause. They show only that Rocappi paid a tax, whether or not under an obligation to do so.
*326 Rocappi has thus not carried its burden of proving that New Jersey’s use of the “regular place of business” test results in unconstitutional multiple taxation within the intendment of the Commerce Clause. Cf. Narragansett Wire Co. v. Norberg, 118 R.I. 596, 376 A.2d 1 (Sup.Ct.1977); Coors Porcelain Co. v. State, 183 Colo. 325, 517 P.2d 838 (Sup.Ct.1973). The Director’s assessments for 1973, 1974 and 1975 are accordingly affirmed. The Clerk of the Tax Court will enter an appropriate judgment.

The appeal was filed for the years 1970 through 1975. At the pretrial conference plaintiff withdrew its complaint for 1970 and at trial it withdrew its complaints for 1971 and 1972.