John K. SJONG, Appellant,

v.

STATE of Alaska, DEPARTMENT OF
REVENUE, Appellee.

No. 4255.

Supreme Court of Alaska.

Jan. 23, 1981.

Douglas M. Fryer, Moriarty, Mikkelborg, Broz, Wells & Fryer, Seattle, Wash., and William B. Rozell, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellant.

Joseph K. Donohue, Teo C. Spengler, Asst. Attys. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

BURKE, Justice.

This case involves the constitutionality of the Alaska Net Income Tax Act, AS 43.20.-010–.350, as applied to non-resident crab fishermen who fish off the coast of Alaska in international waters and sell their catch to Alaska processors. Appellant John K. Sjong, on behalf of eleven other Washington State fishermen, claims that the State of Alaska has no jurisdiction to tax his net income, and that to do so would violate the due process and commerce clauses of the United States Constitution, and section 381 of the Interstate Income Act.[1]

John K. Sjong is a commercial king crab fisherman who resides in the State of Washington. He has fished commercially for at least ten years, and for eight of those years he has owned and operated his own fishing vessel. His fishing vessel is licensed, registered, and harbored in Washington with Seattle as its designated home port. He fishes exclusively in the international waters surrounding Alaska[2] and sells

---

1. 15 U.S.C. § 381 (1976).

2. Sjong testified at the revenue board hearing that he operates his fishing vessel between 5 and 150 miles from the coast line of Alaska.

As provided by 43 U.S.C. § 1312 (1976), a state "may extend its seaward boundaries to a line three geographical miles distant from its coast line."

his catch only to Alaska processors and canneries.

In preparation for the fishing season, Sjong outfits his vessel and hires a crew in Seattle. Most of the crew members are Washington residents, but should a crew member quit or become sick during the season, emergency replacements will be hired in Alaska. Provisions are also taken on in Washington. Although Sjong tries to take enough food and fuel to last the entire voyage, he often purchases fresh food and extra fuel while in port in Alaska.

Prior to journeying to the fishing grounds, Sjong negotiates a market and a price for his catch in Seattle with representatives of various processing companies. Once the fishing season starts, Sjong will come into an Alaska port once every ten to fifteen days to deliver his catch to a processing plant. At that time, possession as well as risk of loss and title is transferred from the fisherman to the processors. Payment for the catch is made in Seattle after the fishing season has ended.

Depending upon the extent of his catch, Sjong will make anywhere from twenty to thirty trips into port each season to sell his crab. While in port, he obtains supplies which enable him to continue his fishing activities; the most important being bait which is purchased from the local canneries and processors. Sjong also enters Alaska ports to obtain emergency medical treatment for sick or injured crew members, or to have emergency repairs performed on his equipment. The ports are also open to his vessel in case shelter is ever needed from storms.

On October 10, 1974, the Alaska State Department of Revenue notified Sjong that they had assessed his personal net income tax for the years 1970, 1971, and 1972, and that he owed $32,481.89 in unpaid taxes. Pursuant to AS 43.20.280,[3] Sjong applied for a hearing on the matter. The Department concluded that Sjong had sufficient minimum contacts with the state to be subject to the net income tax statutes, that his activities in the State were not exempt from taxation under the Interstate Income Law, and that the exact amount of his tax would be determined by the apportionment formula provided for in the state tax statutes. Sjong appealed the Department's decision to the superior court; again, all issues were resolved against him and the taxation was upheld.

In this appeal he raises four arguments in opposition to the taxation of his net income: (1) the tax violates the fourteenth amendment due process clause; (2) the tax violates the commerce clause; (3) the tax violates section 381 of the Interstate Income Act; and (4) the apportionment formula employed by the state results in an unfair allocation of his income.

## I. DUE PROCESS

The first issue on appeal is whether the taxation of Sjong's net income constitutes a taking of property without due process of law. The fourteenth amendment

---

**3.** AS 43.20.280 (repealed in 1976) provided:

(a) A person aggrieved by the action of the department in fixing the amount of a tax or in imposing a penalty may apply to the department within 60 days from the date of the notice required to be given to him by the department, giving notice of the grievance, and request a hearing. At the hearing the department may subpoena witnesses and may administer oaths and make inquiries necessary to determine the amount of the tax due to the state, and if a correction is warranted, the department shall make the correction after the hearing.

(b) Within 30 days after hearing and decision by the department, the taxpayer may file a complaint in the superior court in the judicial district in which he resides, naming the department as defendant, setting out the facts, and stating reasons why the action is erroneous, and praying relief from it, and the clerk of the court shall issue summons in the regular manner....

AS 43.20.280 was repealed in 1976 by ch. 166, § 3 SLA 1976 and has been replaced by AS 43.05.240. A number of changes in the tax law were made in 1976, but since this case was initially brought under the old tax statutes, those statutes then in effect will govern the resolution of this matter.

due process clause [4] limits states from extending their powers of taxation beyond their borders. As such, any attempt to tax extra-territorial values would be an unconstitutional taking of property. In order for a state to constitutionally tax a non-resident, the non-resident must be "sufficiently involved in local events to forge 'some definite link, some minimum connection' sufficient to satisfy due process requirements." *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 465, 79 S.Ct. 357, 366, 3 L.Ed.2d 421, 431 (1959), *quoting Miller Brothers Co. v. Maryland*, 347 U.S. 340, 344–45, 74 S.Ct. 535, 538–539, 98 L.Ed. 744, 748 (1954). John Sjong contends that his contacts with the state are so minimal that there is an insufficient nexus upon which to base a tax.

In determining what constitutes sufficient minimum contacts for the purposes of taxation, the Supreme Court has adopted the following basic test first stated in *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940): "That test is . . . whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. *The simple but controlling question is whether the state has given anything for which it can ask return.*" 311 U.S. at 444, 61 S.Ct. at 250, 85 L.Ed. at 270–71 (emphasis added). As we stated in *North Slope Borough v. Puget Sound Tug & Barge*, 598 P.2d 924, 928 (Alaska 1979):

> Due process requires that a tax be related "to opportunities, benefits, or protection conferred or afforded" by the taxing authority and such a relationship exists "if

the tax is fairly apportioned to the commerce [there] carried on." *Ott v. Mississippi Valley Barge Line Co.*, 336 U.S. 169, 174 [69 S.Ct. 432, 434], 93 L.Ed. 585, 589 (1949).

Therefore, our task is to determine whether the protections, opportunities, and benefits given to Sjong by the state provide a sufficient nexus to uphold the taxation of his net income.[5]

■ As the record in the case indicates, Sjong makes approximately twenty to thirty trips per season into various Alaska ports to sell and deliver his catch of crab to processors and canneries. While in port, Sjong purchases any and all needed supplies and, among other things, makes use of emergency services when necessary.

Sjong argues that all of the services and benefits alluded to by the state are available to any person who travels interstate and should not be the basis for the imposition of a tax. What must be recognized, however, is that unlike the services rendered to an ordinary traveler, the services, benefits, and protections offered to Sjong are directly related to generating his income. Without the opportunity to purchase fresh bait and supplies, he would be severely hampered in his ability to continue his fishing ventures. Further, the availability of emergency medical services, repair facilities, and crew replacement in Alaska clearly benefits his business operations, as does the opportunity to sell his crab without the expenditure and delay of a lengthy trip.

It is precisely this notion, that the benefits afforded to the taxpayer are directly

---

4. The due process clause of the fourteenth amendment provides:

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S.Const. Amend. XIV, § 1.

5. In previously decided cases, contacts which were adjudged to be sufficient to uphold taxation included: maintaining a leased office and several salesmen within a state to solicit orders, *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959); registering as a corporation to do business within a state, *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940); and maintaining a sales service office in the state which served five other states, *Williams v. Stockham Valves & Fittings, Inc.*, 358 U.S 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1950). *See also* the cases cited in note 15 *infra*.

related to "business income generation," which is central to a resolution of this issue. In *Alaska v. Petronia*, 69 Wash.2d 460, 418 P.2d 755 (1966), the Washington State Supreme Court applied this concept in upholding Alaska's taxation of the net income of a nonresident seaman employed on a vessel in Alaskan waters.

As in the instant case, the Washington Supreme Court was faced with the question of whether Petronia had sufficient minimum contacts with the State of Alaska so that taxation of his income would not violate due process. By applying the business income generation concept, the court determined that there were sufficient contacts to justify imposition of a net income tax.

The defendants argue that ... the benefits afforded seamen are *de minimus*; ... that virtually the only benefits available from the state of Alaska to seamen such as the defendants are the protection and benefits they are afforded by the state when they are on shore in strictly a tourist or recreational capacity.

This argument ... is impressive; however, it overlooks a most significant element considered in applying the test of benefits in determining minimum connections. Probably the most significant benefits in the eyes of these defendant seamen are the wages they contemplated receiving for their services during the course of the vessel's voyage. The business productivity generated by Alaska was accountable for the wages earned by the defendants when they were in Alaskan waters.

418 P.2d at 758.

The court went on to conclude: "We are satisfied that the benefits of employment afforded by this economic activity of the state of Alaska constituted minimum connections within the rule to avoid a denial of due process under the Fourteenth Amendment to the United States Constitution." *Id.* at 759.

Similarly, the state in this case has argued that Sjong is also a direct beneficiary of the economic activity of the state. As Sjong testified, he fishes only off the Alaska coast and sells exclusively to Alaska processors. His income is derived solely from the market Alaskan canneries and processors provide for his fishing skills. Indeed, his crab fishing might be rendered totally uneconomic if he were foreclosed from selling to Alaskan processors and had to return to Seattle to sell his catch.

The main distinction between the instant case and the situation described in the *Petronia* case is that Petronia earned his income while employed on a vessel in Alaskan waters. Here, Sjong catches crab outside of Alaska in international waters and then sells them within the state. We do not believe this distinction presents a significant difference, for even though Sjong fishes in international waters, the activities of the state have a substantial effect on his activities. As the state has pointed out, the particular industry which Sjong is involved in, the crab industry, has been fostered by the policies of the state and protected by its various police powers. *See State v. Bundrant*, 546 P.2d 530 (Alaska 1976), *rehearing denied*, 547 P.2d 838 (Alaska 1976).[6]

What is of primary significance in determining the legality of the tax is whether the income was derived from sources in the state. AS 43.20.035(a) states that the income of non-residents is taxable income when it is "attributable to sources in the state." Since Sjong's income is derived from the sale of crab to Alaska processors, that income should be subject to the income tax. Where the crab were actually caught makes no difference.

Sjong also contends that income is earned where the skill is employed to earn that income. In *Petronia*, for example, that portion of Petronia's work performed while his ship was in Alaskan waters was considered to have been income earning and taxable in

---

**6.** In *State v. Bundrant*, we upheld certain state laws and regulations relating to crab fishing beyond the three-mile state jurisdictional limit in the Bering Sea on the grounds that the State had a legitimate objective in regulating the taking of crab outside the State in order to conserve the crab resources existing within the State. *Id.* at 554.

Alaska. Applying the same reasoning, Sjong claims that since the labor to catch the crabs was employed in international waters, no taxable income can be attributed to the state. This argument, however, fails to draw a distinction between income which is the direct result of an individual's labor, and income derived from the sale of goods, such as crab. Absent a sale, the skill and labor used to catch crab would result in no profit or income to the individual.

In *Bass, Ratcliff & Gretton, Ltd. v. State Tax Commission*, 266 U.S. 271, 45 S.Ct. 82, 69 L.Ed. 282 (1924), the United States Supreme Court upheld a state franchise tax assessment based on sales within the State of New York by a British corporation that manufactured ale outside the state. The corporation argued that because it was not incorporated in New York and did not maintain its principal place of business there, New York could not levy a tax merely by reason of its having sales in the state. The Supreme Court said that where "its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York . . .—the process of manufacturing resulting in no profits until it ends in sales,—the state was justified in attributing to New York a just proportion of the profits." 266 U.S. at 282, 45 S.Ct. at 84, 69 L.Ed. at 287. Similarly, the process of fishing results in no profits until the catch is sold to processors in Alaska.[7]

Sjong also argues that the actual sale of the crab catch takes place in Washington, *i.e.*, the contract is negotiated in Washington and payment is made there. The only sale-related activity occurring in Alaska is the delivery of the goods, and delivery alone should not subject him to taxation. In support of this he cites the Supreme Court's decision in *Miller Brothers Co. v. Maryland*, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954), where the Court held that a Delaware store could not be held liable for Maryland use taxes on merchandise sold to Maryland residents because of a lack of minimum contacts. The only contact that the store had with the taxing state was that its truck occasionally entered the state to deliver the previously ordered goods. Sjong argues that since his boat enters the state only to make deliveries, this should not constitute a sufficient nexus to uphold taxation.

The situation in *Miller Brothers* is to be distinguished from the case at bar. First, in *Miller Brothers* the delivery truck entered the state sporadically; it did not make all deliveries. All sales were made outside the state, and the sales made to Maryland residents constituted only a portion of the total of Miller Brothers' overall sales. Here, the taxpayer admits that he has been fishing in Alaska for ten years, and sells exclusively to Alaska processors. His principal source of income is the money which he receives in payment for crab delivered to those processors. The amount of business activity is certainly more substantial than that in *Miller Brothers*.

Second, more than "mere delivery" of goods is taking place within Alaska. What in fact is occurring is the consummation of the *sale* of Sjong's crab. AS 43.20.-130(e)(1)[8] states that "[s]ales of tangible personal property are in this state if (1) the property is delivered or shipped to a purchaser . . . inside this state . . . ." Therefore, a sale has taken place when the crab

---

7. In the alternative, Sjong argues that no income is earned until payment is made and since all payments were made in Seattle, no income should be attributed to the state. Various courts have held, however, that the actual place where income payments are turned over to the taxpayer is not determinative of the source of the income for purposes of state income tax. *See Petition of Union Elec. Co. of Mo.*, 349 Mo. 73, 161 S.W.2d 968, 972 (1942); *In re Kansas City Star Co.*, 346 Mo. 658, 142 S.W.2d 1029, 1039 (1940). Furthermore, a tax-

payer cannot escape a tax on income from sources within the state by billing from the outside or by setting up his machinery so that the income is paid to him in another state. *Gross Income Tax Div. v. Bartlett*, 228 Ind. 505, 93 N.E.2d 174, 177 (1950).

8. AS 43.20.130(e) repealed by ch. 70, § 13, SLA 1975. However, since this case was instituted under the prior tax statutes, those statutes then in effect will govern the resolution of this matter.

are delivered to the processor in Alaska under a previously negotiated contract.[9]

In conclusion, because the state is giving something for which it can ask in return, in the form of supplies, employment, and a market for sale of goods, and the taxed income is derived from sources in the state, there appears to be a sufficient nexus to justify imposition of the tax.

## II. COMMERCE CLAUSE

■ The commerce clause of the United States Constitution [10] places restraints upon the taxing power of states similar to those of the due process clause. In fact, these two constitutional limits overlap to a great extent. The courts, however, have usually placed considerations of minimum contacts and sufficient nexus under the due process heading, while questions regarding the proper apportionment of income to the taxing state and the discriminatory impact of taxes are covered by the Commerce Clause. *Central Greyhound Lines v. Mealey*, 334 U.S. 653, 661, 68 S.Ct. 1260, 1265, 92 L.Ed. 1633, 1640 (1948). *See also Moorman Manufacturing Co. v. Bair*, 437 U.S. 267, 277–79, 98 S.Ct. 2340, 2346–2348, 57 L.Ed.2d 197, 207–08 (1978). Hence, "net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the [tax]." *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 452, 79 S.Ct. 357, 359, 3 L.Ed.2d 421, 424 (1959).

The test used by the United States Supreme Court to determine the validity of a tax under the Commerce Clause was recently expressed in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326, 331 (1977). There, four factors were analyzed to determine the validity of the tax: (1) whether the activity taxed had a sufficient nexus with the taxing state; (2) whether the tax is fairly related to benefits provided by the state to the taxpayer; (3) whether the tax was fairly apportioned to local activities; and (4) whether it discriminated against interstate commerce. As the nexus consideration and questions of the relationship to services provided by the state has been dealt with in the previous due process discussion *supra*, and the apportionment question will be discussed *infra*, the only issue which we will consider here is whether the tax discriminates against interstate commerce.

■ A state may not "impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business" [relative to interstate business]. *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 329, 97 S.Ct. 599, 606, 50 L.Ed.2d 514, 524 (1977), *quoting Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458, 79 S.Ct. 357, 362, 3 L.Ed.2d 421, 427 (1959). There appears to be no indication that this situation is present here. As neither party has briefed this argument, this point will not be considered [11] and whether the commerce clause will be violated by imposition of the state net income tax

---

**9.** Under the Uniform Commercial Code the transaction which occurs in Alaska constitutes a sale. UCC § 2–106(1) provides that a "sale consists in the passing of title from the seller to the buyer for a price." Commenting on this section one authority states: "The transfer of title is the essential element or the distinguishing characteristic of a sale of goods." R. Anderson, Uniform Commercial Code § 2–106, § 2–106:5 at 235 (2d ed. 1970). In testimony before the Department of Revenue, Sjong's attorney said: "I think for the purposes of what we're discussing, the risk of loss passes at the time the crab is delivered. So I would say that title of the crab is with the vessel until such time as it is delivered to the processor."

**10.** The commerce clause is set forth in article I of the United States Constitution: "The Congress shall have the power to . . . regulate commerce with foreign nations, and among the several states, and with the Indian tribes; . . ." U.S. Const. art. I, § 8.

**11.** Where a point is not given more than a cursory statement in the argument portion of a brief, such point will not be considered by the supreme court. *Lewis v. State*, 469 P.2d 689 (Alaska 1970). *See also Kristich v. State*, 550 P.2d 796 (Alaska 1976); *Miller v. City of Fairbanks*, 509 P.2d 826 (Alaska 1973).

should be determined in light of the other overlapping areas of discussion.

### III. INTERSTATE INCOME LAW EXEMPTION

Sjong's third argument in support of his contention that there is no jurisdiction to tax him is that the State is prohibited from taxing his activities under section 381(a) of the Interstate Income Law.[12] Public Law 86–272 was enacted in 1959 as a congressional limitation on the Supreme Court's decision in the *Northwestern States* case,[13] in response to a tremendous outcry from interstate businesses who saw themselves potentially subject to numerous state and local taxes.[14]

The pertinent part of section 381 states:
*Imposition of net income tax*

*Minimum standards*

(a) No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:

(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State . . . .

The only case in which the United States Supreme Court has interpreted the Inter-

state Income Law is apparently *Heublein, Inc. v. South Carolina Tax Commission*, 409 U.S. 275, 93 S.Ct. 483, 34 L.Ed.2d 472 (1972). The holding of that case, however, actually had very little to do with section 381. *Heublein* concerned a South Carolina liquor regulation and the interaction between that regulation, section 381, and the twenty-first amendment to the United States Constitution.[15] The Court concluded that even though the regulation required an interstate business to undertake activities within the taxing state which would take it beyond the ambit of section 381 protection, the state was not deliberately attempting to structure its regulations so as to justify imposition of a tax. The regulation was held valid and "§ 381 does not apply." 409 U.S. at 284, 93 S.Ct. at 489, 34 L.Ed.2d at 480.

Of the lower court cases which have interpreted Public Law 86–272, practically all have been concerned with interpretation of the word "solicitation." The strongest line of cases comes from decisions of the Oregon Supreme Court. The first case, *Smith, Kline & French Laboratories v. State Tax Commission*, 241 Or. 50, 403 P.2d 375, 377 (1965), interpreted the term broadly by holding that it included all "lesser, included phases" of solicitation, such as pre-solicitation promotional work, so that such activities alone would not cause an interstate business to lose its section 381 exemption. The Oregon Supreme Court has, however, in subsequent decisions, significantly narrowed its interpretation of this key term, and has excluded from interstate tax exemption any activities not directly leading to the placing of orders.[16]

---

**12.** Pub.L. 86–272, codified at 15 U.S.C. §§ 381–384 (1976).

**13.** 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959).

**14.** *See* S.Rep. No. 658, 86th Cong., 1st Sess., *reprinted in* [1959] U.S. Code Cong. & Ad. News, pp. 2548, 2549–50.

**15.** The twenty-first amendment gives to the states power to regulate sales of alcoholic beverages. Section 2 of the amendment provides that "[t]he transportation or importation into

any State . . . for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S.Const. amend. XXI.

**16.** For example, in *Olympia Brewing Co. v. Dep't. of Revenue*, 266 Or. 309, 511 P.2d 837 (Ore.1973), *cert. denied*, 415 U.S. 976, 94 S.Ct. 1561, 39 L.Ed.2d 872 (1974), the presence of beer kegs by which retailers could dispense draft beer destroyed the section 381(a) exemption and was sufficient to justify imposition of the state corporation income tax. Other activi-

Sjong contends that because his activities in the state consist solely of the delivery of goods previously ordered under contracts negotiated outside of the state, he should be exempt from taxation. He argues that section 381(a) should not be read so narrowly as to require all those activities described in the section to be present for exemption from taxation. He relies heavily on *Smith, Kline* to support this view. However, as the Oregon court's interpretation of the basic holding of *Smith, Kline* has narrowed considerably, we feel his reliance on a broad construction of section 381(a) is untenable.

■■■ In their decisions, the superior court and revenue board held that in order for an interstate business to qualify for a section 381(a) exemption, the business activities must conform strictly to the language of the statute. We agree with this interpretation of section 381(a); that in order to qualify for the exemption, a business must solicit orders, which are sent out of state for approval, and then make deliveries into the state. Since Sjong's acts concern only the third part of the described activity—deliveries—it does not come within the statutory exemption.

Looking at the original legislative intent, this would seem to be a correct interpretation. As the bill was originally passed to cover the types of activities litigated in the *Northwestern States* case, and the activities there consisted of in-state solicitation coupled with out-of-state approval and delivery, the mere act of delivery should not be sufficient to bring an interstate business within the scope of section 381(a) coverage. In fact, the Senate Report specifically states, "[t]o qualify, however, all such orders must be sent outside the State for approval or rejection, and if approved, must be filled by shipment or delivery from a point outside the State." [17] This seems to indicate exactly what types of activities were intended to be protected by the bill. To interpret Sjong's activities as falling within the exemption of section 381(a) would controvert the legislative intent.

Furthermore, what is occurring in the case at bar is not the mere delivery of goods, but also the sale of tangible personal property within the state, and such sales are not covered by the section 381(a) exemption either. In conclusion, Sjong's activities go beyond the solicitation and delivery requirements of section 381, and are not exempt under the Interstate Income Law.

## IV. THE APPORTIONMENT FORMULA

Having determined that the state has jurisdiction to tax Sjong's net income, the next issue we must address concerns the proper apportionment of the tax. Sjong contends that the apportionment formula adopted by the Department results in an unfair allocation of his income to the state.

■■■ The purpose of apportionment is to ensure that only activities within the taxing state are subject to taxation. An apportionment formula is valid under the due process and commerce clauses only if, as a tax measure, it assigns to a state income that can reasonably be said to result from activities or properties within its borders. *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 462, 79 S.Ct. 357, 364, 3 L.Ed.2d 421, 429–30 (1959). In analyzing the apportionment formula, we utilize a two-step process. First, we must address the question of whether the apportionment formula as a whole is constitutional. Second, if it is found to be acceptable, it must then pass the test of fairness as applied to the individual taxpayer's situation. *Norfolk & Western Railway Co. v. North*

ties which the court found went beyond solicitation included: replacing and servicing damaged merchandise, *Miles Laboratories, Inc. v. Dep't of Revenue*, 274 Or. 395, 546 P.2d 1081 (1976); holding consultations and contracts for sale of goods, *Iron Fireman Mfrg. Co. v. State Tax Comm'n*, 251 Or. 227, 445 P.2d 126 (1968); and collection by salesmen of initial deposits on merchandise, *Herff Jones Co. v. State Tax Comm'n*, 247 Or. 404, 430 P.2d 998 (1967). For a discussion on the Oregon line of cases, *see* Hartman, *"Solicitation" and "Delivery" Under Public Law 86–272: An Uncharted Course*, 29 Vand.L.Rev. 353, 364–77 (1976).

**17.** [1959] U.S. Code Cong. & Ad. News, p. 2548.

*Carolina*, 297 U.S. 682, 685, 56 S.Ct. 625, 627, 80 L.Ed. 977, 980 (1936).

Concerning the first step, the United States Supreme Court, in reviewing appeals on the proper allocation and apportionment of taxes, has refused to impose strict constitutional restraints on a state's apportionment formula. Recognizing the artificiality of such formulas, the Court states a readiness to sustain any formula reasonably designed to determine the net income attributable to business done in the taxing state. "[R]ough approximation rather than precision" is sufficient. *International Harvester Co. v. Evatt*, 329 U.S. 416, 422, 67 S.Ct. 444, 447, 91 L.Ed. 390, 395 (1947), *citing Illinois Central Railroad Co. v. Minnesota*, 309 U.S. 157, 161, 60 S.Ct. 419, 422, 84 L.Ed. 670, 674 (1940). "Unless a palpably disproportionate result comes from an apportionment, a result which makes it patent that the tax is levied upon interstate commerce rather than upon an intrastate privilege, this Court has not been willing to nullify honest state efforts to make apportionments." *International Harvester Co. v. Evatt*, 329 U.S. at 422–23, 67 S.Ct. at 447, 91 L.Ed. at 395.

■ Therefore, a heavy burden is placed on a taxpayer challenging a state's allocation of his income to prove by "clear and cogent evidence" that the income attributed to the state is "out of all appropriate proportion to the business transacted ... in that State," or has "led to a grossly distorted result." *Moorman Manufacturing Co. v. Bair*, 437 U.S. 267, 274, 98 S.Ct. 2340, 2345, 57 L.Ed.2d 197, 205 (1978), *quoting Hans Rees' Sons v. North Carolina ex rel. Maxwell*, 283 U.S. 123, 135, 51 S.Ct. 385, 389, 75 L.Ed. 879, 908 (1931) and *Norfolk & Western Railroad Co. v. Missouri Tax Commission*, 390 U.S. 317, 326, 88 S.Ct. 995, 1001, 19 L.Ed.2d 1201, 1208 (1968).

In the original assessment of the tax, the Department of Revenue relied on Revenue Ruling 74–2 [18] which stated:

It must be remembered that the fishing vessel must have actual business activity in more than one taxing jurisdiction to apportion. The mere fact that a boat winters in Seattle or some other port does not give it nexus in that state ... If all fish products are taken in international waters and sold in Alaska only, apportionment shall not apply and all income from fishing is to be reported to Alaska. . . .

On the basis of this Ruling, the Department originally refused to apportion Sjong's income and allocated the entire sum to the State. Following Sjong's protest, hearings were held and sufficient contacts with the State of Washington were found to require apportionment. The Department employed the formula outlined in AS 43.20.130(a),[19] resulting in an allocation of approximately 85–92% of Sjong's income to the State for the years in question.

The apportionment formula takes into consideration three factors: Sales, property, and payroll. AS 43.20.130(e)(1) provides that "sales of tangible personal property are in this state if (1) the property is delivered or shipped to a purchaser ... inside this state regardless of the f.o.b. point or other conditions of the sale . . . ." The Department concluded: "The crab are tangible personal property delivered to a purchaser within Alaska and regardless of the other conditions of the sale (for instance, a market negotiated outside the State) are assignable to Alaska for purposes of the sale factor." Because all of the sales of crab were made in Alaska, 100% of sales was allocated to the state.

(a) All business income which cannot be directly apportioned and allocated to this state shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

**18.** Revenue Ruling 74–2, dated February 20, 1974, was promulgated in response to a request from Sjong on the question of the proper allocation and apportionment of income to the state from fishing operations. Revenue Ruling 74–2 is reprinted in [1974] Alaska Tax Reports (CCH) ¶ 200–160.

**19.** AS 43.20.130(a) (repealed ch. 70, § 13, SLA 1975) provided:

Applying the standard provided in AS 43.20.130(g),[20] the property factor was calculated on the basis of the "port-day" method. This consists of a ratio of the number of days spent in ports inside the state to the total number of days spent in ports inside and outside the state. For purposes of fishing vessels, the port-day method excludes idle time between fishing seasons or between charters, but does include time spent stocking the boat with supplies and readying it for departure on a fishing voyage, cleaning it up after a voyage, and time spent delivering fish and taking on additional supplies during the fishing season.

The hearing examiner noted two alternative means of calculating the payroll factor:

> [W]here the income producing activity is attributable to the operation of a vessel on the high seas as in fishing activities, . . . the payroll of employees engaged in operating the vessels, should be assigned to the State pursuant to the "port day" method . . . . [but] where the port day method does not reasonably approximate the value of wages accountable for by the business generated by Alaska, the payroll factor should be determined by reference to the corresponding sales of fish or crab.

Relying on the provisions of AS 43.20.-130(g), the hearing examiner also apportioned the payroll factor pursuant to the port-day method. However, the Department of Revenue rejected the examiner's calculation and chose to adopt a different means of apportionment. In light of the fact that the earnings of the fishing crew were directly dependent upon the sale of the catch of crabs, the Department calculated the payroll factor on the basis of sales in Alaska, i. e., 100%.

Sjong contends that since more than 95% of his business activity is conducted outside of Alaska, a formula which allocates approximately 85–92% of his income to the state is manifestly unfair. The courts, however, have upheld allocations which take into account income earned outside of the taxing state's borders, so long as the values can be "reasonably attributable" to activities occurring within the taxing state. In *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 445, 61 S.Ct. 246, 250, 85 L.Ed. 267, 271 (1940), the Court said there was nothing unconstitutional about a tax which is contingent upon events brought to pass without a state, so long as there is a nexus between such tax and transactions within a state for which the tax is an exaction. Due process does not prohibit a formula which considers out-of-state activity in evaluating the local activity. *International Harvester Co. v. Evatt*, 329 U.S. at 423, 67 S.Ct. at 447, 91 L.Ed. at 395. So, in the instant case, the mere fact that the sales of crab in Alaska are contingent upon negotiations in Seattle and crab fishing in international waters should not act to invalidate the tax. Our task is not to determine whether this formula is the best method of apportioning income, but merely whether it is fairly calculated to assign to the state that portion of net income reasonably attributable to the business done in the state. This it seems to have done.

The second step is to determine whether the formula as applied to the individual taxpayer has produced a fair apportionment. The taxpayer has made two challenges to the apportionment scheme. He first challenges the employment of the port-day formula in calculating the property fac-

---

**20.** AS 43.20.130(g) (repealed ch. 70, § 13, SLA 1975) provided:

> (g) The value of vessels operating on the high seas and compensation of employees engaged in operating the vessels shall be apportioned to the state in the ratio which the number of days spent in ports inside the state bears to the total number of days spent in ports inside and outside the state. The term "days spent in ports" does not include periods when ships are tied up because of strikes or withheld from the Alaska service for repairs, or because of seasonal reduction of service. Days in port are computed by dividing the aggregate number of hours in all ports by 24. The value of aircraft and automotive vehicles operating as freight and passenger carriers from, to, and inside the state and compensation of employees so engaged are apportioned to the state in the ratio which the number of days during which the services are rendered inside the state bears to the total number of days during which the services are rendered inside and outside the state.

tor, and argues that a voyage-day formula be used in its place. The "voyage-day" formula would apportion the vessel's income on the basis of a ratio of the number of days in the state to the number of days inside and outside of the state. *See Luckenbach Steamship Co. v. Franchise Tax Board*, 219 Cal.App.2d 710, 33 Cal.Rptr. 544, 547 (1963). This, he claims, would take into consideration time spent making repairs on the boat, and negotiating a market for his crab catch; factors which the "port-day" formula does not take into account.

■■■ Sjong has not shown that the port-day method results in a gross distortion of his tax. True, he has argued that one formula may be slightly fairer than the other and may better represent his particular activities, but courts do not usually invalidate an assessment unless the tax is "out of all appropriate proportion to the business transacted . . . in that state." *Hans Rees' Sons v. North Carolina*, 283 U.S. 123, 135, 51 S.Ct. 385, 389, 75 L.Ed. 879, 908 (1931). This he has not shown, and in light of his failure to do so, the employment of the port-day formula should be upheld.

■■■ Sjong's second argument is that the Department should not have allocated 100% of the sales and payroll to the state when over 95% of his business activity is conducted outside the state. The statute in question, AS 43.20.130(e)(1) provides that "Sales of tangible personal property are in this state if (1) the property is delivered or shipped to a purchaser . . . inside this state." All of Sjong's sales are made in Alaska and a 90% allocation of income to the state does not produce a gross distortion. In fact, failure to allocate sales to the state in which they are made would greatly underrepresent the extent of the taxpayer's activities within the state.

Finally, under AS 43.20.140,[21] the Department had the discretion to base the payroll factor on sales if it determined the port-day formula did not fully represent the extent of the taxpayer's business activity in the state. Given that Sjong's earnings were dependent upon sales, it is hard to conclude that there was no reasonable basis for its decision.

■■■ Because the allocation formula is constitutional on its face, and has not produced a grossly distorted result in the assessment of Sjong's tax liability, we hold the Department's apportionment formula valid.

## V. ATTORNEY'S FEES

The final issue in this appeal is whether the superior court abused its discretion in awarding $1,775 to the state for its attorney's fees. Because he had a statutory right to appeal the decision of the taxing authority to the superior court,[22] Sjong contends that the court erred. He relies upon our decision in *Crisp v. Kenai Peninsula Borough School District*, 587 P.2d 1168 (Alaska 1978).

In *Crisp*, we reversed an award of attorney's fees against a dismissed tenured teacher in his unsuccessful appeal to the superior court from his employer's decision to terminate his contract.[23] In our opinion, we stated: "Given Crisp's statutorily guaranteed right to contest his dismissal in the courts, we think it would be manifestly unreasonable to penalize the exercise of that right by allowing an award of *any* attorney's fees to the school district." *Id.* at 1169 (footnote omitted) (emphasis in original).

Upon further reflection we realize that our statement in *Crisp* may be subject to misinterpretation. In that case we were influenced by the importance of the right being asserted. In a very real sense Crisp's entire future was at stake, due to the damage likely to be done to his professional

---

21. AS 43.20.140 is repealed by ch. 70 § 13, SLA 1975.

22. *See* note 3, *supra*.

23. AS 14.20.205 provides tenured teachers a right to judicial review of their termination as follows:

*Judicial review.* If a school board reaches a decision unfavorable to a teacher, the teacher is entitled to a de novo trial in the superior court. However, a teacher who has not attained tenure rights is not entitled to judicial review according to this section.

reputation by the school board's action. Because of this we concluded that the risk of liability for the employer's attorney's fees was an impermissible burden to place on one in Crisp's position. 587 P.2d at 1170, n. 7.

There are a multitude of administrative decisions, however, including the one in the case at bar, having consequences far less significant. Many of these decisions are appealable to the courts. As to these, the rule announced in *Crisp* does not apply. In such cases the courts may continue to assess reasonable attorney's fees against the losing party. *See* Rules 29(d) and 45, Alaska R.App.P.; *Kodiak Western Alaska Airlines, Inc. v. Bob Harris Flying Service, Inc.*, 592 P.2d 1200, 1204–05 (Alaska 1979).

Since we are unable to say that the superior court's award of attorney's fees in this case amounted to an abuse of discretion, we uphold the award.[24]

The judgment of the superior court is AFFIRMED.

---

24. Sjong also argues that because this appeal involves a question of genuine public interest brought in good faith, it would constitute an abuse of discretion to award attorney's fees against a losing party. *Gilbert v. State*, 526 P.2d 1131, 1136 (Alaska 1974). A tax dispute which primarily concerns the taxpayer's own tax liability is not the type of public interest suit contemplated in *Gilbert*. Such is the case here.