**ALASKA GOLD COMPANY, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF REVENUE, Appellee.**

No. S–1892.

Supreme Court of Alaska.

April 22, 1988.

Rehearing Denied May 6, 1988.

Joseph M. Wilson and George R. Lyle, Guess & Rudd, Anchorage, for appellant.

David T. LeBlond, Asst. Atty. Gen., Anchorage, Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

### I. INTRODUCTION

This is a corporate tax case arising under the Multistate Tax Compact, AS 43.19.010–43.19.050, and the Alaska Net Income Tax Act, AS 43.20.010–43.20.350. The taxpayer, Alaska Gold Company (Alaska Gold) was assessed additional income taxes when the Alaska Department of Revenue determined that it was a member of a group of "unitary corporations" including its parent, UV Industries, Inc. (UV) and a non-Alaska subsidiary of UV, Mueller Brass Company (Mueller).

Alaska Gold does not dispute that it is in a unitary group with UV. The issue here is whether Mueller was part of the unitary business of UV during the tax years in question so that Mueller's net income was

validly combined with UV's, whose income in turn was combined with Alaska Gold's; this total was then allocated and apportioned for purposes of determining Alaska Gold's state corporate income tax. Alaska Gold also raises a second issue: even if Mueller and UV are found to be unitary, it contends that that unitary group is still separate from the UV/Alaska Gold unitary group, and thus Mueller's income is still not subject to state taxation through Alaska Gold.

The superior court, affirming the Alaska Department of Revenue ruling, found that Mueller and UV were in fact unitary, and since UV and Alaska Gold were unitary, Mueller's income was properly included in the tax base used to assess Alaska Gold's income tax. Alaska Gold appeals that decision.

We affirm the superior court's decision.

### II. FACTS AND PROCEEDINGS BELOW

Alaska Gold Company, an 85% owned subsidiary of UV Industries, Inc., is a Delaware corporation engaged in exploration and gold mining near Nome. For the tax years 1975, 1976, and 1977, Alaska Gold filed its Alaska Corporation Net Income Tax Returns showing no tax due. The Department of Revenue issued a notice to Alaska Gold assessing an additional $457,734, before interest, in corporate taxes for 1975–77. The state tax auditor found the deficiency when he adjusted Alaska Gold's income by using the "worldwide combined reporting method and apportionment." Essentially, he combined the income of UV and its subsidiaries, then apportioned some of the total net income to Alaska Gold to reflect the portion earned in this state.

Following a Notice of Disagreement filed by Alaska Gold, and an informal conference with the Audit Division, Alaska Gold's assessment was decreased to $77,023, plus interest. This decision concluded[1] that one of UV's subsidiaries, Federal Pacific Elec-

---

1. The decision also discussed other issues unrelated to this case on appeal, such as the inclusion of certain unused Alaska property in the determination of the apportionment fraction, and the effect of out-of-state gold sales. These decisions were not appealed.

tric Company, was not "unitary with UV and/or Alaska Gold during the audit years. Accordingly, [they] adjusted apportionable income ... to exclude Federal Pacific and its subsidiaries." However, the decision upheld the auditor's determination that Alaska Gold was in a unitary business with UV and its other subsidiaries, including Mueller; this was based on unities of ownership and operations, and on "dependency or contribution" among the group members.

At Alaska Gold's request, a formal hearing was held before Revenue Hearing Examiner Donald M. Bullock, Jr. At the hearing, Alaska Gold stated that its "[e]mphasis ... will be placed not on the unitary connection of Alaska Gold and U.V. ... [R]ather it will be placed on the unitary combination by the State of Alaska on U.V. Industries and Mueller Brass Company." Hearing testimony explained that UV had three business divisions: the electrical equipment segment (run by Federal Pacific, a subsidiary which the Audit Division found was not unitary with UV), the natural resources segment (including as one part of a large multistate copper, coal, oil, gas, and gold operation, Alaska Gold, admitted to be unitary with UV), and the copper and brass fabrication segment (including Mueller, the subsidiary whose unitariness with UV is at issue). Evidence was presented which provided detailed facts regarding the "closeness" of UV and Mueller, such as salary arrangements, common board members, parent approval of operations, insurance and professional plans, loan guaranties, and day-to-day operations.

The Revenue Hearing Examiner concluded that UV and Mueller were unitary because they were functionally integrated, had centralized management, and shared economies of scale.[2] On appeal, the superi-

or court made an independent review of the issue of unitariness, and affirmed the Revenue Hearing Examiner's decision. Through similar reasoning, the superior court held that Alaska Gold failed to meet its burden of proving by clear and cogent evidence that Mueller and UV were not part of a unitary business. Alaska Gold appeals.

## III. DISCUSSION

### A. Standard of Review

■ In *Earth Resources Company of Alaska v. State, Department of Revenue,* 665 P.2d 960, 965 (Alaska 1983), we stated that: "the substitution of judgment standard of review should be applied by courts reviewing the [Revenue] Department's application of the unitary business concept to a taxpayer's business activity." That case rejected the substantial evidence standard of review[3] as well as the rational basis standard.[4]

The case at bar involves the same issue addressed in *Earth Resources:* the propriety of an agency determination of unitariness for multistate tax purposes. Nonetheless, the state argues that this court should not use its independent judgment, but should apply the reasonable basis standard.

In *Container Corp. of America v. Franchise Tax Board,* 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545, *reh'g denied,* 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983)[5] the United States Supreme Court adopted a non-interventionist view towards the review of cases involving the unitariness determination. The court noted that the constitutional limits on the principle are well defined, and that its task is to determine if the state court "applied the correct standards" and if "its judgment 'was within the realm of permissible judgment.' "

---

**2.** The decision also dismissed Alaska Gold's claim that the combination and apportionment statutes were unconstitutional as applied to them.

**3.** The facts were undisputed, so the sole question was one of law. *Earth Resources,* 665 P.2d at 964.

**4.** The agency appealed from was not "making law by creating standards," nor were there any policy questions lying within the agency's expertise. *Earth Resources,* 665 P.2d at 964.

**5.** This case was decided less than five months after *Earth Resources.*

*Container,* 463 U.S. at 176, 103 S.Ct. at 2946, 77 L.Ed.2d at 560 (footnote omitted). The state supports its argument with a footnote in *Earth Resources* which says that the Department's decision arguably could require the rational basis standard because the Department could be said to be "making law," or the unitary determination could be said to involve agency expertise. *Earth Resources,* 665 P.2d at 965 n. 7.

The state's argument is unpersuasive. *Container* involves the United States Supreme Court's position in reviewing state court decisions. We have clearly adopted a different standard for reviewing Alaska Department of Revenue decisions. Also, the footnote in *Earth Resources* appeared in the lengthy case discussion setting forth all the possible standards before the court unequivocally settled upon the substitution of judgment test. For these reasons, we apply the standard announced in *Earth Resources* and review this case de novo.[6] We note, however, that in exercising our independent judgment, we give some weight to the administrative decision in this matter. *See National Bank of Alaska v. State, Dep't of Revenue,* 642 P.2d 811, 815 (Alaska 1982); *State, Dep't of Revenue v. Debenham Elec. Supply Co.,* 612 P.2d 1001, 1003 n. 6 (Alaska 1980).

### B. *Are Mueller and UV Involved in a Unitary Operation Within AS 43.-20.031(i)?*

■ "[O]ne who attacks an apportionment formula's application to a unitary business may do so only with a showing of clear and cogent evidence." *Earth Resources,* 665 P.2d at 971 (footnote omitted). *See also Sjong v. State, Dep't of Revenue,* 622 P.2d 967, 976 (Alaska 1981), *appeal dismissed,* 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982). Thus, only if Alaska Gold can meet the burden of proving by clear and cogent evidence that Mueller and

UV are not unitary will we reverse the superior court's decision.

"If a company is a unitary-business, then a state may apply an apportionment formula to the taxpayer's total income in order to obtain a 'rough approximation' of the corporate income that is reasonably related to the activities conducted within the taxing state." *Earth Resources,* 665 P.2d at 966 n. 13. In *Earth Resources,* Alaska adopted the United States Supreme Court's method for determining whether unity exists, which was first used in *F.W. Woolworth Co. v. Taxation and Revenue Department,* 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed. 2d 819 (1982). That test looks for "factors of profitability" which evidence a unitary business. The test is "whether contributions to income of subsidiaries resulted from functional integration, centralization of management and economies of scale." *Earth Resources,* 665 P.2d at 967 (quoting *Woolworth,* 458 U.S. at 364, 102 S.Ct. at 3135, 73 L.Ed.2d at 827–28).[7] If these three factors exist in this case, then a finding that Mueller and UV were engaged in a unitary business is required.

Having independently reviewed the record, and having given some weight to the administrative decision, we conclude that Alaska Gold has failed to meet its burden of proving by clear and cogent evidence that Mueller and UV are not unitary. We therefore affirm the decision of the superior court.

#### 1. *Functional Integration*

■ To meet its burden, Alaska Gold must show that Mueller was performing "autonomously and independently of the parent company." *Woolworth,* 458 U.S. at 365, 102 S.Ct. at 3135, 73 L.Ed.2d at 828.

While it is true that Mueller maintained its own tax department, had its own insurance plans, retained its own counsel, and made its own decisions as to daily operations, other facts lead us to conclude that

---

**6.** *See also City of Nome v. Catholic Bishop of Northern Alaska,* 707 P.2d 870, 876 (Alaska 1985) (substitution of judgment test used to review decision regarding tax exempt status); *Madison v. Alaska, Dep't of Fish & Game,* 696 P.2d 168, 173 (Alaska 1985) (substitution of judgment

standard applies since the question is one of statutory interpretation).

**7.** In *Earth Resources* and *Container,* the court held that a unitary business did exist; in *Woolworth,* the businesses were held not unitary.

Mueller and UV were functionally integrated. Each year Mueller submitted its financial plan to the president of UV. All capital expenditures in excess of $100,000 had to be approved by UV. Executive salaries above $30,000 had to be approved by UV's president or the compensation committee of UV's Board of Directors.

While Mueller maintained its own accounting department, the executive payroll accounting for Mueller was performed by UV. In addition, the companies had an output contract whereby all of the copper produced by UV in New Mexico was sold to Mueller. While it is true that these sales were at prevailing market prices, they are nonetheless evidence that the companies were not acting independently.[8] This situation differs substantially from that in *Woolworth* where there were no intercompany sales of inventory. *Woolworth*, 458 U.S. at 365 n. 13, 102 S.Ct. at 3136 n. 13, 73 L.Ed.2d at 828 n. 13.

In *Earth Resources*, 665 P.2d at 968, we found the parent's involvement in the finances of the subsidiary to be an important consideration in finding functional integration. In that case, the parent had made direct loans to the subsidiary, guaranteed bank loans, and acted as a guarantor on performance bonds. *Id.* at 968–69. While UV's connection with Mueller's financing was not as extensive, it nonetheless was present. Mueller obtained industrial revenue bonds for the purpose of improving its plants in Michigan and Mississippi. The financing arrangement provided that the cities would acquire the project from Mueller, lease the facilities back to it, and Mueller would pledge the rents as security to the bondholders. As part of this arrangement, UV guaranteed Mueller's lease obligation. In addition, UV guaranteed five million dollars of pollution control revenue bonds on behalf of Mueller.

Based upon the above, we conclude that the evidence demonstrates that Mueller benefitted by functional integration with UV.

### 2. Centralization of Management

■ In *Earth Resources*, we found that centralization of management existed by virtue of the parent's majority ownership of the subsidiary and the extensive ties between the management of the parent and the subsidiary. *Id.* at 969. That case contrasted *Woolworth* where "none of the subsidiaries' officers ... was a current or former employee of the parent." *Earth Resources*, 665 P.2d at 969. We noted that a parent's majority interest in a subsidiary would "indicate that [the parent] in fact exercised control over the management of [the subsidiary]." *Id.* Even though in *Earth Resources* the subsidiary's board included some minority shareholders, we found that the parent still had full control, and its choice to elect minority directors did not destroy that conclusion. We cited *ASARCO, Inc. v. Idaho State Tax Commission*, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed. 2d 787 (1982) as a consistent exception to this rule: the subsidiaries in *ASARCO* were autonomous only because the controlling parent had agreed not to exercise its full voting rights.

Mueller is 100% owned by UV and UV thus elected all the directors. Significantly, Mueller and UV had five directors in common, and one Mueller officer was on the UV board. In addition, Mueller's president was chosen by UV. These facts closely parallel those in *Earth Resources* and indicate, along with the facts discussed in the previous section, that UV was involved in the management of Mueller.

### 3. Economies of Scale

■ The final factor in determining whether the two businesses were unitary

---

**8.** Alaska Gold cites *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 178, 103 S.Ct. 2933, 2947, 77 L.Ed.2d 545, 561, *reh'g denied*, 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983), where the Supreme Court stated that unitariness needs to be based on "a flow of *value*, not a flow of goods." The Supreme Court held that a bright line test for unitariness based solely on a flow of goods was improper. The Court never suggested that an examination of the flow of goods was not a relevant consideration. In fact, the Supreme Court indicated that the flow of goods could be indicative of an integrated business. "[S]ubstantial interdependence can arise in any number of ways; a substantial flow of goods clearly is one but just as clearly not the only one." *Container*, 463 U.S. at 179, 103 S.Ct. at 2947, 77 L.Ed.2d at 562.

for tax attribution purposes is the extent to which Mueller benefited from economies of scale in its affiliation with UV. This factor is intimately related to the other factors we have discussed and the facts considered there are relevant here as well. In *Earth Resources* we noted that the subsidiary benefited from economies of scale in part due to the availability of financing at lower rates, the parent's umbrella insurance coverage for the subsidiaries, and the parent's auto leasing program. *Earth Resources*, 665 P.2d at 970.

In this case there was no auto leasing program. While Mueller maintained its own insurance coverage, it used a common insurance broker with UV to secure coverage. It is unclear if this resulted in a better premium for Mueller. UV also guaranteed Mueller's obligations in connection with the industrial revenue and pollution control bonds.

An additional consideration in this case is that Mueller paid UV $216,000 per year as an estimate of general corporate administrative expenses. Similarly, the subsidiary in *Earth Resources* paid its parent $150,000 per year which we viewed as a management fee paid "in recognition of the value of these services and economic benefits which [the subsidiary] derived from its parent...." *Earth Resources*, 665 P.2d at 970. Mueller also benefited from the fact that its executive payroll accounting was performed by UV.

Finally, in the *Container* case, the Court stated that it was not unreasonable for the court below to consider "only as one element among many" the fact that the two corporations were engaged in the "same line of business." *Container*, 463 U.S. at 178, 103 S.Ct. at 2947, 77 L.Ed.2d at 561. The limited presumption of unitariness was based on the fact that two corporations who are in the same line of business often benefit from economies of scale or sharing of expertise and resources. *Id.* UV and Mueller can be considered to be in the same line of business since UV sold all its copper output to Mueller. This is unlike the case where a parent owns a subsidiary for the sole purpose of diversifying its portfolio;

here the two corporations are related. UV recognized the benefits of this relationship. In its 1976 10–K report, filed with the Security and Exchange Commission, the company stated:

.UV's first mill for the processing of copper ore was completed in 1967 as part of a program to make copper available to Mueller in order to reduce its dependence on outside sources. In 1973, in conjunction with a capital expansion program which substantially increased Mueller's production capacity, a second processing mill was completed more than doubling the [UV's] total copper ore milling capacity.

We believe the evidence indicates that Mueller benefited by economies of scale.

■ Looking at the evidence as a whole, we believe that Alaska Gold has failed to meet its burden of proving by clear and cogent evidence that Mueller and UV were not unitary. Using our independent judgment and giving some weight to the Department's decision in this matter, we conclude that the evidence shows that Mueller received contributions to its income which resulted from functional integration, centralization of management, and economies of scale.

C. *Is the Alaska Gold/UV Unitary Group Separate From the Mueller/UV Group?*

■ Alaska Gold raised a second issue: even if Mueller and UV are found to be unitary, the Alaska Gold/UV group is separate from the Mueller/UV group, such that Mueller's activities are wholly unrelated to Alaska Gold. Alaska Gold cites J. Hellerstein & W. Hellerstein, *State Taxation I: Corporate Income and Franchise Taxes* ¶ 8.11[6][e] (1983) for the proposition that a parent corporation can belong to two unitary groups which themselves are not unitary. While this argument is plausible, we refuse to decide the matter because Alaska Gold failed to properly raise this issue in the proceedings below.

Generally, a party may not present new issues or advance new theories to secure a reversal of a lower court decision. *Zeman*

*v. Lufthansa German Airlines,* 699 P.2d 1274, 1280 (Alaska 1985); *Williams v. Alyeska Pipeline Serv.,* 650 P.2d 343, 351 (Alaska 1982). The rule that objections must be made below in order to preserve a point on appeal normally should also be followed for appeals from administrative agencies. *Storrs v. Lutheran Hospitals & Homes Society of America, Inc.,* 609 P.2d 24, 28 n. 13 (Alaska 1980). Exceptions to this general rule exist, however, where a new issue is "critical to a proper and just decision," *Vest v. First Nat'l Bank of Fairbanks,* 659 P.2d 1233, 1234 n. 2 (Alaska 1983), or where it is "not dependent on any new or controverted facts, and . . . it is closely related to [the] trial court theory and could have been gleaned from its pleadings." *O'Neill Investigations v. Illinois Employers Ins. of Wausau,* 636 P.2d 1170, 1175 n. 7 (Alaska 1981). *See also White v. Alaska Commercial Fisheries Entry Comm'n,* 678 P.2d 1319, 1322 (Alaska 1984) (this court considered a point not specifically argued at the agency hearing because it was "manifest on the record").

A review of the record indicates that while Alaska Gold raised the issue of its unity with Mueller below, it was Alaska Gold's contention that UV and Mueller were not unitary and therefore Alaska Gold and Mueller were not. It was not until oral argument on appeal in the superior court that Alaska Gold raised the argument that its grouping with UV should be considered separately from any Mueller/UV grouping.

The record in this case offers little with respect to the relationship between Alaska Gold/UV and Mueller/UV, if, indeed, they are separate groups. This is because the assumption of the Revenue Department, the superior court, and Alaska Gold seems always to have been that only the Mueller/UV unity was relevant. Under these circumstances, we find it inappropriate to decide this issue.

AFFIRMED.

BURKE, Justice, with whom, MOORE, Justice, joins, dissenting.

Although I agree with the majority's basic presentation of the facts, I cannot agree that those facts support the majority's conclusion that UV and Mueller operated as a unitary business.

I

The majority concludes that UV and Mueller are functionally integrated. However, I believe that the facts lead to the conclusion that Mueller acted "autonomously and independently" from UV. *F.W. Woolworth Co. v. Taxation and Revenue Dep't,* 458 U.S. 354, 365, 102 S.Ct. 3128, 3135, 73 L.Ed.2d 819, 828 (1982). The record shows that Mueller's management made its own decisions regarding production output, customer credit extensions, merchandise storage, and site selection for its plant expansion. Only those capital expenditures in excess of $100,000 required UV approval; all other expenditures were within the sole discretion of Mueller's management. Further, Mueller managed its own, albeit small, advertising budget with no input from UV. It had its own accounting and tax departments with its own staff, its own separately-staffed, separately-funded pension plans, retained its own outside counsel, and had its own insurance plans maintained without UV review or consultation. Although Mueller's executive salaries above $30,000 needed approval from the UV president, it is clear that, on the whole, Mueller was responsible for its own finances and daily operations.

The majority finds evidence of integration in the copper output contract between Mueller and UV. Although this may be one indication of integration, I do not believe it deserves the emphasis afforded it by the majority. The copper sales were made at the prevailing market prices determined according to price lists published in *Metals Week,* an independent trade journal. Thus, there was no special economic advantage for UV, despite this flow of goods. Since the copper sales were conducted at arms-length, the contract does not provide a sufficient basis for finding functional integration.

Finally, the majority reasons that the circumstances here are similar to those

present in *Earth Resources of Alaska v. State, Dep't of Revenue*, 665 P.2d 960, 968 (Alaska 1983), where we looked at the extent of the parent's involvement in the subsidiaries' finances. In *Earth Resources*, the parent financed the subsidiaries' business operations by making direct loans, guaranteeing bank loans, and acting as guarantor on performance bonds on several occasions. *Id.* Moreover, the parent established mandatory salary guidelines for its subsidiaries and provided a company-wide retirement plan. *Id.* at 969. In contrast, as the hearing examiner found, there were "no actual cases of advances or other indebtedness between UV and Mueller" in 1975, 1976, or 1977, and Mueller had its own entirely independent pension plan. UV did guarantee Mueller's lease obligations in connection with two industrial development revenue bonds, but this limited involvement falls far short of the activity which we found sufficient in *Earth Resources*.

On the whole, Mueller's financial transactions were conducted entirely independently from UV. Thus, I would hold that the two companies were not functionally integrated.

## II

Although Mueller is a wholly-owned subsidiary of UV, the facts fail to support the majority's conclusion that Mueller and UV shared one centralized management. In *Earth Resources*, we did not base our finding of centralized management solely upon the parent's 100% ownership in the subsidiary or upon the existence of shared officers and directors. Rather, we also relied on the fact that the "parent corporation appear[ed] to be primarily in the business of running and overseeing its subsidiaries." 665 P.2d at 969. In addition, we recognized in that case that the parent held company-wide management meetings annually for the purpose of assuring uniform pay scales for all of its subsidiaries, that there was a common stock purchase plan for all sala-

ried employees and a common executive compensation plan based on performance, and that the parent's chief legal officer provided assistance to the subsidiary in connection with the issuance of stock and other corporate functions. *Id.* at 969–70.

In contrast, absolutely none of these factors existed in the UV/Mueller relationship. First, according to the affidavit of Mueller's president, the one Mueller officer who was also on the UV board had no responsibilities or duties with respect to Mueller's daily operations. Second, UV is not "primarily in the business of running ... its subsidiaries." *Id.* at 969. Rather, UV is involved in the manufacture and sale of electrical and copper products, and the extraction of natural resources, it has its own totally separate business. *See Woolworth*, 458 U.S. at 367, 102 S.Ct. at 3136–37, 73 L.Ed.2d at 830 (although parent was actively involved in the same form of business as its subsidiaries, the fact that the parent had no department, as such, devoted to overseeing the subsidiaries favored a finding of no centralized management). Third, there is no evidence that UV held any company-wide meetings or established any uniform pay scales. In fact, Mueller paid the salaries of all of its employees, established its own salary adjustments based on performance, and had its own incentive compensation plans, since Mueller employees were not eligible to participate in UV's incentive compensation plans. Finally, in light of Mueller's autonomy in developing its annual financial plan,[1] its separate accounting system, separate pension plan, separate training program, separate purchasing department and general independence in all aspects of decision-making, I am convinced that no centralized management existed.

## III

As the majority notes, whether economies of scale exist is inextricably related to the other two factors. For the reasons already discussed, I believe that the over-

1. These plans needed UV approval, but the submissions were invariably accepted without modification.

whelming evidence of Mueller's autonomy outweighs the isolated instances of UV control, and I would, therefore, hold that the usual economies of scale are absent in this case.

Unlike the situation in *Earth Resources*, 665 P.2d at 970, Mueller did not receive any direct loans from UV and there is no evidence that Mueller obtained financing from outside sources at more favorable rates because of its relationship with UV. Furthermore, Mueller had its own group medical, surgical, dental, life insurance[2] and pension plans, whereas the parent in *Earth Resources* had one umbrella insurance plan for its subsidiaries. *Id.* Finally, there was no arrangement between UV and Mueller for auto leasing. Thus, this situation differs markedly from that in *Earth Resources*.[3]

### IV

I believe that Alaska Gold has met its burden of showing, by clear and cogent evidence, that Mueller and UV did not operate as a unitary business. I view the few instances of UV control as merely "the type of occasional oversight ... that any parent gives to an investment in a subsidiary," *Woolworth*, 458 U.S. at 369, 102 S.Ct. at 3138, 73 L.Ed.2d at 831, and hence not indicative of a unitary business. Therefore, I would reverse.

---

2. The fact that UV and Mueller used a common insurance broker is insignificant. Much more relevant is the fact that Mueller's insurance programs were maintained "without review by or consultation with UV officials," and that there were no blanket policies covering both companies.

3. The majority refers to "an additional consideration" here: the $216,000 per year Mueller paid to UV. I do not believe that this is an indicant of economies of scale; in fact, this amount was an estimate of administrative expenses, and tends to suggest that Mueller and UV maintained separate identities. With this fee, Mueller actually *paid for* the few services UV provided, such as preparation of the executive payroll. Such payment indicates that the two companies did not "share" resources or provide gratuitous services for each other, but that they interacted as two autonomous businesses would.